[Crim. No. 2991.   First Dist., Div. Two.   Mar. 21, 1955.]

THE PEOPLE, Respondent, v. CARL E. BROWN et al.,
Appellants.

Leslie C. Gillen, Sol A. Abrams, Edward T. Mancuso, Public Defender, and Joseph I. McNamara, Deputy Public Defender, for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond M. Momboisse, Deputy Attorney General, Thomas C. Lynch, District Attorney (San Francisco) and Norman Elkington, Chief Assistant District Attorney, for Respondent.

NOURSE, P. J.—Appellants and one Joseph Tenner were accused in one indictment in two counts: (1) Conspiracy to commit murder; (2) assault with a deadly weapon with intent to commit murder on Florence Brown. All defendants pleaded not guilty and Stoner moreover not guilty because of insanity. On both counts the jury found Brown and Stoner guilty, Tenner or Tannenbaum not guilty. After disagreement of the first jury as to Stoner's sanity, a second jury found him sane. Motions for a new trial by Brown and

Stoner were denied and they appeal from the judgments and orders denying a new trial. The appellants have filed joint briefs and many of the points raised apply to both and others to Brown singularly. We use the word "appellants" herein as applying to the contentions of both and of each individually.

In the evening of October 6th, 1952, Mrs. Brown was found in her bedroom in the Brown apartment at 896 Eddy Street, San Francisco, covered with blood. On a chair in the living room was a ballpeen hammer which proved to have human blood and hair on the ball. Beneath wounds on the back of Mrs. Brown's head, which could have been caused with that hammer, the bone of the skull had been shattered and depressed about 1½ inches. There was a pool of blood at the bottom of the television set in the living room and a trail of blood from there to the bedroom. Mrs. Brown had no recollection whatever of what happened after 7 o'clock in the evening of October 6 until she found herself in a hospital. She thought she had been in an automobile accident. Mr. Brown at different times told police there was nothing helpful he could offer.

On December 11, 1952, defendant Stoner was arrested by the Spokane police. On December 12, 1952, he made a confession to District Attorney Lynch and Inspector John O'Haire who went to Spokane, which confession was transcribed and the next day a further confession which was recorded. These confessions state in detail, to be mentioned later, his conspiracy with Brown and Tenner to kill Mrs. Brown so that Brown would get her money, the assault on Mrs. Brown with the ballpeen hammer placed by Brown near the television set for that purpose, the price Stoner would get for the killing, his contact with Brown and payments made by Brown to him after the act. Before the grand jury Stoner voluntarily testified to the same effect as these confessions and he made three supplemental confessions in San Francisco when he was taken to places where he had before stated he had done certain things. However, on December 28, 1952, in a statement to the three attorneys of the three defendants Stoner retracted his implication of Brown and Tenner, contending that his statements in that respect were made at the instigation of District Attorney Lynch who had offered him immunity. Until the trial, however, Stoner did not contend that he himself was not guilty of the assault. But at the trial he took the position that when in the evening of October 6 he went into the Brown

apartment he saw blood on the television set, and the hammer and Mrs. Brown covered with blood on the bed and he got scared and ran. His six confessions and his testimony before the grand jury were admitted in evidence after a *voir dire* examination in which there had been a conflict between testimony of Stoner and of prosecution witnesses as to the free and voluntary character of his statements and as to the alleged offer of immunity. It is conceded that this conflict was resolved in the trial court against defendant and no error is predicated on this decision. However, said statements of Stoner were offered only as against himself and the jury was admonished repeatedly that they could only be used against him. Although the appeal is briefed in combined briefs of both Brown and Stoner the position of these two defendants is completely different. With respect to Stoner there is no contention that the evidence does not support the verdict; with respect to Brown it is contended that if the confessions of Stoner are eliminated there is no substantial evidence to support either of the two guilty verdicts.

With respect to Stoner the evidence with inclusion of the confessions is so overwhelming that any error urged in the briefs and to be mentioned later cannot have been prejudicial. All Stoner's confessions are in general wholly coherent and in accord with each other and in many points are corroborated by independent evidence. If the several confessions and testimony before the grand jury are taken together the substance of them is mainly as follows:

He had first met Brown when Brown had acted as his attorney in a criminal matter and when he had been released Brown had given him room and board and he had worked for him as a handyman in Brown's house and apartment from August until October 1952. Stoner also went with Brown to Mexico in the matter of Mexican divorce papers of one of Brown's clients. Through Brown he met Joe Tenner. In August or September there had been conversations indicating that Brown and Tenner wished to have Mrs. Brown killed so that Brown would get her money which they then could use for a place in Lafayette, the Acapulco, which Tenner wished to acquire and for a yacht Brown wished to buy. Stoner would get from $500 to $5,000; Brown's Cadillac and Tenner's car. The first attack on Mrs. Brown was planned with Brown for the evening of September 26th. Stoner was to hide in the apartment while Mrs. Brown was away visiting a friend in a hospital. Alibis both for Brown and Stoner were

arranged. Stoner was to go out of town with friends but return for the killing and Brown would pass the evening with a colleague, Don Pettus, and bring him back home later to find the body. On the 25th Stoner went on a double date to the peninsula in Brown's Cadillac but something happened to the rear axle and the car had to be towed into Belmont. After the car had been repaired there he drove it the next day back to San Francisco leaving his girl friend in Belmont. He ate dinner with Brown who told him where he would leave a hammer in the apartment. Stoner later entered the apartment but Mrs. Brown returned unexpectedly when he had just got in and had not yet turned on the light. He did not dare go on with the plan. He told her he was waiting for Brown and stayed for some time but when Brown did not come and a telephone call showed his girl friend had become impatient, he left and took Brown's car first to Belmont and then to his home in San Diego. He had long distance telephone conversations with Brown who wanted him to try again but first to arrange in Mexico the matter of the divorce papers, which he did. In San Diego Stoner met a friend of his, Calvin Brown, (herein further called Calvin) whom he took along back to San Francisco promising him a job with defendant Brown. In San Francisco on the morning of October 6 at a service station Stoner asked Calvin to call Brown's office; after a few tries Calvin reached Brown on the phone and Stoner spoke to him and made an appointment in Chinatown. During lunch there they arranged for the killing that night. Brown would tell Mrs. Brown that Stoner would be over that night to fix the television set and would place the hammer and some other tools behind the set. It should be made to look like a robbery; Brown would go to the bank and get money and tell the police that he had given it to her. Again the company of Pettus would be used as Brown's alibi. In the evening Stoner went with Calvin in Brown's Cadillac to the apartment. Stoner went up whereas Calvin remained down in the car looking at the Brown windows. Stoner knocked on the apartment door and paced around until Mrs. Brown opened it and said something like ''Hi, it is you.'' He told her that he had come to fix the television set. He made her help by holding a wire and when she knelt down doing so he hit her on the head with the hammer which he found with other tools behind the set. He threw the hammer into a chair and went into the bedroom where he grabbed Mrs. Brown's billfold out of her purse and a .38 re-

volver from the top of a cabinet and went back to the car where he told Calvin: "Get the hell out of here, I think I killed her." They drove to a gas station where Stoner changed clothes. Stoner tried to reach Brown at Andy Wong's where Brown was to meet him but he was not there. The second time he phoned Andy Wong's Don Pettus came to the phone. He was also to be there to be used again as alibi. Don Pettus said that Brown probably was in his office and Stoner reached him there and made an appointment to meet in Quincy Street, an alley between California and Pine Streets. They met there, Calvin being left at the corner of the alley. When Brown got into the car he offered Stoner $100 but Stoner wanted more money and the pink slip of Brown's Cadillac. Brown said then to go down to his office. Brown could not find his keys to the office and had to ask the janitress to let him in. In the office Brown called his apartment and when the telephone was not answered he was satisfied that the deed was done and gave Stoner $500 and the pink slip of the Cadillac and said: "I'll see you later on when this cools off." Stoner gave Brown the .38 revolver he had taken from the apartment and left town after picking up Calvin. He gave Calvin the billfold of Mrs. Brown to tear it up together with identification cards and such that were in it. Calvin threw the pieces out of the car window, but when they stopped at a restaurant in Los Banos Calvin found part of the wallet sticking to the car door. He took it off and threw it on the ground. They went to San Diego to Calvin's home. Two days later in a telephone conversation with Brown he heard that Mrs. Brown was in a hospital in critical condition, that she couldn't remember what had happened to her and that she was not being watched. He and Calvin then decided to go back to San Francisco to finish the job. On the way there they rented a room at a motel near Oakland. Stoner phoned Mount Zion Hospital, asked for Mrs. Brown and talked to the night nurse but when there was some delay he feared the call was being traced and they went off in the car and passed the night in the Town House in Oakland. From there on October 10th Stoner called Brown and they made an appointment to meet at the Yacht Club. They talked in the Cadillac. Brown told Stoner that he had to have the car back because people were wondering where his car was and told Stoner to get out of town by plane. Stoner returned the pink slip and gave him papers he had obtained for him in Mexico. He picked up Calvin and drove with him to the airport where he parked the Cadillac.

Brown came there also and gave him some money. They went back by plane to San Diego. Stoner went on to Mazatlan, Mexico. He had several telephone conversations with Brown in that time, mostly about the condition of Mrs. Brown and her memory of the night of the attack. Brown told him that he was trying to put into her mind that Stoner at that time had phoned from San Diego, and that he had not given any information to the police so that they also thought that Stoner had been in San Diego. Stoner in those calls also asked for money and Brown sent him money either under Brown's own name or under the name of George Malone. Including the $500 he received the night of October 6th he got approximately $1,000 from Brown. From Mazatlan he returned to San Diego. He went back again to San Francisco on November 11th to get the Cadillac. He had then another friend, Willie Taylor, with him. They stayed at the Regent Hotel in San Francisco under assumed names. He had conversations with Brown by telephone and personally. Brown did not wish to give him the car because Mrs. Brown was thinking that Stoner might have made the attack, and was also suspecting Brown now. He advised Stoner to stay away from Inspector Cahill. He also urged Stoner to kill Mrs. Brown at a beach house where she was staying. Brown gave him $100. Thereafter Stoner went to El Centro, next to Butte and finally Spokane. From each place he telephoned Brown who told him that Mrs. Brown still could not remember, that Inspector Cahill was looking for him. Brown sometimes sent him money. In Spokane Stoner was arrested.

These confessions are amply corroborated. Mrs. Brown testified that approximately two weeks before she was brought to the hospital she surprised Stoner in her apartment in the dark at 8 o'clock in the evening. Much of the corroboration is formed by the testimony of Calvin. He testified as to the telephone conversation from the booth at the service station in the morning of October 6th, that after Stoner had failed to reach Brown he gave Calvin a number and asked him to call. A lady secretary told him that Brown was busy. He then gave the number of the booth and the name Howard Patton, because Stoner had told him not to use his own name. When Calvin phoned again the lady said Brown was just through; a man then said, "Carl Brown speaking." Calvin gave the phone to Stoner who said, "Hello, Carl" and closed the door. After the telephone call Stoner said he had to see Carl and was going over with a cab. He told Calvin to

wait at the service station. Stoner came back around 12 or 12:15.

That evening (the time of the assault) Mrs. Brown was seen by the witness Moye in the doorway of her apartment saying to a man who answered Stoner's description in height and dress, "Oh, it's you." Blood was found near the television set and blood and hair on the hammer. The hammer was found in a chair in the living room where Stoner stated he threw it. Calvin testified that Stoner when he went into the apartment house and left Calvin in the parked car had pointed out to him the window of the apartment to which he was going. That a few minutes after he had gone the shadow of a woman moved by the window and right after a man's figure who pulled the shade down. Stoner returned in five minutes and when he got in the car told Calvin to drive straight on and said: "I killed her; I hit her seven times with a ball peen hammer." He was nervous and shaky. He asked if Calvin could see any blood on him and whether Calvin could see his arm moving up and down. Stoner had then a wallet and a .38 revolver, which he had not had before. He told Calvin to draw into a gas station; he had to get in touch with Carl right away. Stoner changed clothes at the gas station, saying that he had been seen by someone in the apartment house and phoned twice asking for Carl Brown. After the call he said he had to go to meet Carl right away. Stoner drove to an intersection on California, put Calvin off and placed him opposite a side street and himself drove into that street, stopped there a few seconds and drove on. A minute or two later he saw the car again come around a corner; then a man was sitting next to Stoner. It was 8:20 by a clock on a tower when the Cadillac drove off. Stoner came back after 15 minutes and said they were going right back to San Diego. Later Stoner asked him to straighten the money in his wallet which he said was over $500. On the way up from San Diego there had been only $30. He said he had given the revolver back to Carl. Calvin also testified to the tearing up of the wallet and contents, and the finding and throwing down of a piece of the wallet near a restaurant in a little town. A portion of the wallet was found by police near the telephone booth of the restaurant Stoner had mentioned. Further Calvin corroborated the unexpected departure in the night from the motel near Oakland, when Stoner told him that he phoned the hospital where Mrs. Brown was and that he was afraid his call had been traced. Moreover Stoner at the trial generally corrobo-

rated his factual movements as contained in his confession although he changed their meaning. All long distance calls mentioned in the confessions were corroborated at the trial by telephone records.

The above evidence overwhelmingly proves Stoner's guilt as to both counts, the conspiracy with Brown to commit murder, and the assault with a deadly weapon with the intent to commit murder. However, it is argued that the confessions made after the arrest of Stoner are hearsay as to Brown and no proof of the conspiracy, so that they cannot become admissible as to Brown under section 1870, subdivision 6, Code of Civil Procedure. ■ "It is well settled that after a conspiracy to commit an unlawful act is established, every act of each member of the conspiracy in pursuance of their original plan is in contemplation of law the act of all of them." (*People* v. *Harper*, 25 Cal.2d 862, 870 [156 P.2d 249].)

■ The strongest independent evidence against Brown consists in his attempts to cover up incriminating circumstances like his contact with Stoner on the day of the assault and thereafter, the use of Brown's car by Stoner, his payment of money to Stoner. Although the evidence shows without conflict that Stoner had Brown's Cadillac from September 25 until October 10, Brown declared twice to the authorities that Stoner had had no access to the Cadillac later than two weeks before the assault. As stated before Brown denied all contact with Stoner on October 6th. However from the stated testimony of Calvin and the notation in Brown's telephone record the jury could conclude that on that morning he had a telephone conversation with Stoner which he wished to cover up. The same applies to the meeting after the attack. Here again there is the evidence of Calvin, as to telephoning by Stoner from a gas station, which is corroborated by the testimony of Pettus, that that evening he spoke at Andy Wong's on the telephone to somebody who had asked for Brown and told him that Brown was not there, that he was expected and might be reached at his office and Calvin's further evidence as to Stoner's parking in Quincy Street and passing thereafter in the car with a man. Stoner also testified that he called Brown from the service station. "I knew he was expecting to have me call, so I went down on purpose, to go up and see him." Although Brown claimed that he did not receive a phone call from Stoner, did not leave the office before he finally left to meet Pettus at Andy

Wong's and that he had had no visitor, Miss Hogan, janitress in the building in which Brown had his office, testified that on the evening of October 6 she took Brown down in the elevator at approximately 8:30 and that he came back with another man 10 or 15 minutes later. She took them up to Brown's floor. Brown rang again for her and asked her to unlock his office with her pass key; he had left his keys in his car. She went with him to his office and opened it. Both men went inside. From this evidence the jury could conclude that immediately after the attack Stoner phoned Brown, that Brown went out and came back with somebody which circumstances he did not wish to be known, and that that person was Stoner. There is then the further evidence of Calvin that Stoner when he came back no longer had the .38 revolver which he had when he came from the apartment house and had $500 more than he had before. No .38 revolver, as seen by Calvin, was later found in Brown's office. Brown on October 7 told police that no gun was missing from the apartment, but the jury could believe Calvin's evidence that Stoner had taken a gun from there.

The meeting on October 10 between Stoner and Brown after which the Cadillac was returned at the airport took place in the car at an out of the way place (the Yacht Club). Brown's testimony that it took place there because he had been to Marin County to serve papers—which were not served —is unbelievable. The jury could conclude that the arrangement was made for the purpose of secrecy. Brown sent money to Stoner after the assault giving the alias George Malone and sending the telegraphic money orders each time from a different Western Union office. The jury could conclude that this again was done for the purpose of secrecy. Brown's explanation that Stoner might be questioned and that his secretary quarrelled about the payments to Stoner does not explain the use of a false name. On December 13, 1952, Brown declared to the authorities that he had sent Stoner money to San Diego only. It was proved that he sent money orders under the name of George Malone to Butte, Montana and to Spokane, Washington also. On the same date he stated that he had had no telephone conversation with Stoner for more than a couple of weeks, whereas he had had more recent conversations with him by phone to El Centro, Butte and Spokane. He also stated that he had not seen Stoner since two weeks prior to the assault, whereas he had seen him on October 6, October 10 and November 13.

(The last meeting is also corroborated by Stoner's friend Willie Taylor who testified to Brown's panic when he saw that he, an unknown person, was with Stoner when Brown came to see Stoner.)

Some other circumstances pointed out by respondent are noteworthy: On the evening of both visits of Stoner to Mrs. Brown, Brown was in the company of Pettus and brought him home with him and on October 6th he made the appointment with Pettus around noon (after having spoken to Stoner). Brown went home on October 6th at 4 p. m. so that he had an opportunity to place the hammer near the television set; he testified that the ballpeen hammer (not a normal household implement) had been in the apartment off and on for a year. Mrs. Brown testified that she had never seen anything like it in the apartment. Respondent also points out independent evidence as to possible motive of Brown. He was not happy in his marriage and wanted separation before the assault. (After the assault he still said that such would be best.) There was also evidence indicating a relation with another woman around the time of the assault. Moreover Brown may have had a financial interest in Mrs. Brown's death. He had been the attorney for Mr. Richardson, Mrs. Brown's former husband, and after Richardson's death on August 21, 1950, he was the attorney for Mrs. Brown. Mrs. Brown testified that she entrusted to Brown the large amount of money contained in Mr. Richardson's safe deposit box and later another amount of more than $5,000. Mr. Brown gave her a receipt for $14,320 received for deposit. Although the evidence as to time and amounts received is not quite clear, Mr. Brown admitted receipt of similar amounts but contended that he had bought in October or November, 1951 a cashier's check of $10,000 in his own name which he later gave over to Mrs. Richardson. At the Crocker First National Bank, where Mr. Brown banked, no such check or application for it could be found. Brown and Mrs. Richardson executed a joint and several will, dated October 28, 1951, in which Mrs. Richardson left specific property to her son, the balance to Brown. Mr. Brown and Mrs. Richardson were married February 28, 1952. After a quarrel about a girl Mr. Brown returned one exemplar of the will to Mrs. Brown who later destroyed it and made a will leaving her whole estate to her son. However the joint will had been executed in twofold and Mr. Brown kept an executed copy in his office. At the trial Brown thought it a problem

whether he would have presented that will for probate if after Mrs. Brown's death no other will had been offered. Mrs. Brown testified that the receipt for $14,320 and her new will dated September 17, 1952, were always in her safety deposit box in the Crocker First National Bank. Evidence of personnel of said bank showed that on October 27, 1952, when Mrs. Brown was in the hospital after the assault, Mr. Brown asked access to that safety box for the purpose of surrendering it. As the box was in the name of Mrs. Brown only, access was refused and Mr. Brown was told that the bank would have to call Mrs. Brown in the hospital. Brown then said that the police would not allow it. Brown contended at the trial that he had asked to surrender another empty box which Mrs. Brown had recently rented for a special purpose. However the bank clerk was certain that the keys which Mr. Brown showed him were those of the old box. Mrs. Brown testified that the keys were in a bag of hers in her closet when she went to the hospital and that they disappeared. She had given Brown no authority to surrender that box. Mrs. Brown had also advanced to Brown and Tenner $6,700 in connection with the intended purchase of the Acapulco Club (mentioned by Stoner). She testified that the money was to go in escrow. It was spent without the Acapulco being acquired. Brown took $1,400 for attorney's fees for his work on the deal, of which work there was no specification, and Mrs. Brown was not told about it.

The above independent evidence is sufficient as prima facie evidence of the conspiracy as to Brown.　■　To make evidence of the acts and declarations of an alleged conspirator relating to the conspiracy admissible against the other (Code Civ. Proc., § 1870, subd. 6) the conspiracy need be proved only to the extent of establishing prima facie evidence of that fact. (*People* v. *Steccone,* 36 Cal.2d 234, 238 [223 P.2d 17].)

■　This prima facie evidence is based on Brown's acts, lies and possible motive and is not objectionable as such although it derives its meaning in large part from the fact that the assault by Stoner is considered proved. If such an independently proved substantive crime of one conspirator could not be considered in evaluating the acts and relations of other conspirators as showing a common purpose, the provision of section 1870, subdivision 6, would lose most of its importance. As a rule a conspiracy cannot be directly proved but must be inferred from the relation of the acts of the different conspirators. (*People* v. *Griffin,* 98 Cal.App.2d 1,

43 [219 P.2d 519].) *People* v. *Curtis,* 106 Cal.App.2d 321, 325, 327 [235 P.2d 51], cited by respondent, seems to go in that direction but is not very clear. ██ See the paraphrase given in 11 California Jurisprudence 2d 261: "Although proof of a conspiracy cannot be shown by extra judicial declarations of co-conspirators, evidence of the acts and conversations constituting the agreement is admissible under § 1850 of the Code of Civil Procedure, since such acts and conversations form 'a part of the transaction' which is in dispute." Eleven American Jurisprudence 575 says that the courts are not agreed as to whether declarations of a co-conspirator are admissible as to the preliminary proof of conspiracy. If this prima facie proof is sufficient all the acts and statements of Stoner in the presence of Calvin mentioned earlier become evidence also against Brown, e.g., Stoner's statement after the telephone conversation in the morning of October 6 that he had to go by taxi to meet Brown, his statements as to the assault, his statement after the subsequent telephone conversation from the service station that he had to meet Brown right away, his statement after he returned from his meeting with Brown that he had given the revolver taken at the apartment back to Brown or had left it in Brown's truck. When these and similar statements of Stoner are also considered the verdict as to Brown's participation in the conspiracy is sufficiently supported. The jury need not have believed the evidence as to the alibi of Brown at the time Calvin testified Stoner went to meet him in the morning of October 6, as to which alibi there were indications of fabrication.

██ Appellant's contention that the assault on Mrs. Brown necessarily terminated the conspiracy and that no acts or statements after that event can be considered is without merit. The purpose of the conspiracy was not attained by the assault as Mrs. Brown survived and there is evidence indicating that the purpose had not been abandoned when Stoner returned to San Franciscon on October 10. ██ Moreover the conspiracy "may, for various purposes, extend in point of time beyond the actual commission of the substantive crime, providing there is some evidence showing that subsequent activities of the conspirators were a part of their scheme or plan." (11 Cal.Jur.2d 223 and cases there cited.) Examples are division of the loot and payment for participation in the crime. (*People* v. *Ross,* 46 Cal.App.2d 385, 395-396 [116 P.2d 81]) and acts contemplating escaping punish-

ment (*People* v. *Tinnin*, 136 Cal.App. 301, 306 [28 P.2d 951].)

The stated acts and declarations of Stoner are admissible as against Brown under such rule.

It is next contended that, although Stoner's confessions were admitted against Stoner alone the failure to delete therefrom the portions relating to Brown, especially the repeated references to Brown's alleged culpability, constituted prejudicial error which could not be corrected by admonition to the jury. Appellant Brown points out a great number of references to him in the admitted confessions apt to influence the jury against him, notwithstanding the repeated admonition of the court that the confessions could not be used against him.

It must be conceded that a large part of Stoner's confessions was detrimental to Brown, but we cannot concede that any portion of them should have been stricken. The trial court was overgenerous to Brown when it limited these confessions to the case against Stoner. The indictment against both defendants carried a count charging both with an "assault with intent to commit murder" under Penal Code, section 217, page 34. Stoner was merely the hired killer for Brown who prepared the whole scene of the crime, provided the weapon used, and paid his agent for performing the murderous act. It needs no citation of authorities to support the statement that conversations between principal and agent in preparation of an act to be performed by the agent for the benefit of the principal are binding and admissible against both. Here Brown hired Stoner as his agent to kill Brown's wife. We could eliminate from consideration all the "confessions" since Stoner's testimony was sufficient to prove Brown's participation. It is this testimony of Stoner which is important here rather than what is found in Stoner's confessions and that testimony completes the case against Brown.

The general principle is stated as follows in 22 Corpus Juris Secundum 922: ". . . Evidence which is relevant and otherwise admissible is not to be excluded because it may also have a tendency to prejudice defendant or his codefendants . . . or because it is capable of being distorted to unfair and prejudicial uses, accused's remedy being to have the jury's attention directed to the legitimate purposes and legal effect of the evidence."

In this case all conversations of Brown and Stoner relating to the killing of Mrs. Brown, its desirability, the opportunities and means for it, the means to cover up the

crime, Stoner's remuneration and all contact between the two in relation to these subjects were generally admissible.

No specific objection or motion or "suggestion" to delete on the ground here treated was made when Stoner's first two (Spokane) confessions and his statements before the grand jury were actually offered in evidence. Only after all three had been read to the jury did the attorneys of Brown and Tenner revert to this point citing *People* v. *Zammora*, 66 Cal.App.2d 166 [152 P.2d 180], and moved for a mistrial. And after this was denied, they moved to strike specific parts from the confessions, which motion was also denied. Both denials were correct. Even if the confessions read to the jury contained objectionable matter no sufficient motion to delete it was timely made and striking of parts after they had been read to the jury would not serve any good purpose. The confession had been admitted as to Stoner only and the jury had been clearly so instructed.

The next grievance is that the court failed to give an instruction proposed by defendants in the words of section 32 Penal Code defining an accessory after the fact. It is contended that this instruction should have been given because there was evidence from which the jury could have concluded that Brown's communications with Stoner and his providing of money to Stoner after the assault took place and after Brown had learned that Stoner had committed the assault were all made with the intent of making him avoid or escape arrest (without evidence that he was involved before the assault took place.)

When the same grievance was urged at the hearing of the motion for a new trial the trial judge took the position that it had been agreed between counsel and court that there would be no instruction on any lesser included offense, and when it was urged that accessory after the fact was not such an offense, he stated that then there was no point to the argument. It seems clear that assisting a principal after the commission of a crime is not necessarily included in the main crime itself in the sense of section 1159, Penal Code. (See section 972, Penal Code, which permits prosecution of the accessory alone and *People* v. *Wallin,* 32 Cal.2d 803, 807 [197 P.2d 734], which holds that the crime of the accessory is separate and distinct.) The stipulation does not seem to cover an instruction as to an accessory after the fact.

With respect to necessarily included offenses it is the duty of the court to instruct the jury on any such offense of

which there is any evidence, and the failure to give such instruction is prejudicial error. (*People* v. *Carmen*, 36 Cal.2d 768, 773 [228 P.2d 281].) This follows from the general rule there stated: "It is elementary that the court should instruct the jury upon every material question upon which there is any evidence deserving of any consideration whatever."

Appellants' contention that there is here evidence from which it could be concluded that Brown was only an accessory after the fact is not supported by the record.

The Carmen case (*supra*) merely follows the settled rule that, in a trial for murder, when the evidence raises the issue of manslaughter, an instruction covering the minor offense must be given. The theory of the case is based squarely on the showing that evidence was present which would have supported a conviction on the minor offense. The position of the respondent is clearly stated in respondent's brief from which we quote: "May we point out that at no time during the trial did the appellant Brown assert that he was assisting Stoner in avoiding arrest. The reverse is the case. Brown continually asserted that all of his associations with Stoner after the attack were in no way intended to assist Stoner in avoiding arrest. All of their telephone conversations were related to the divorce papers which Stoner was to get in Mexico, or were requests by Stoner for money. The meeting between Stoner and Brown at the Yacht Club was only for the purpose of handing over these divorce papers, returning Brown's Cadillac, and paying Stoner for his services. Brown explained that all of the money which he had given Stoner was in payment for work which the latter had done for him, or in payment of Stoner's compensation claim. He constantly denied any knowledge that Stoner was sought by the police. If such were true, as Brown claims how could he have aided Stoner with the 'intent of avoiding arrest'?"

The rule of *People* v. *Sanchez*, 30 Cal.2d 560, 567-568 [184 P.2d 673], is controlling here. It was there held that it was not error to refuse to instruct the jury on an issue which was contrary to the defendant's testimony. Here Brown consistently denied all activities in aid of Stoner's escape from arrest. No other witness testified to the contrary. The moneys paid to Stoner by Brown were all paid or contracted for before the assault. They were paid as wages for the contemplated murder—not in aid of Stoner's flight from arrest.

The next error of law argued is that the trial court, after defendant Stoner had testified on *voir dire* as to the

admissibility of his confession, permitted the prosecution to extend his cross-examination to the case in chief. Respondent argues that the position taken repeatedly by Stoner that District Attorney Lynch and Inspector O'Haire told him to say what he put in his confessions, although he denied it to them, constitutes an implied denial of guilt and that some testimony volunteered by Stoner moreover constituted an express denial of guilt in the case in chief and thereby opened up this subject. It must, however, first be noted that later Stoner testified in his own behalf in the case in chief so that thereafter he could be cross-examined—and was cross-examined at length—as to all points here complained of. It is contended that the premature questioning on these points "forced" Stoner on the advice of counsel repeatedly to invoke his constitutional right in the presence of the jury. Considering the overwhelming evidence against Stoner this cannot have caused a miscarriage of justice even if Stoner contrary to the express ruling of the trial judge was entitled to invoke the privilege. The contention that there could also be prejudice to Brown seems wholly hypothetical and there is no showing of any prejudice by the premature questioning. It would seem that Stoner's denial that the confession contained his original statements to the authorities did not impliedly deny his guilt. If this were accepted a separate hearing on *voir dire* would become impossible. However, Stoner also said: "That part about sex crimes, both Inspector O'Haire and Mr. Lynch said, 'Did I say that,' but I never even touched the woman in my life." The court held that the last phrase was a denial of the assault and there seems no reason to hold said construction impossible. It is contended on appeal that this was only a denial of a sex crime. However in the long argument on this matter before the trial court in the absence of the jury that contention was never made. The point argued in this respect was mainly that Stoner had not said, "I never even touched *the* woman in my life" but "I never even touched *a* woman in my life." It is also argued on appeal that even if Stoner had volunteered a denial this would not have opened the door to cross-examination as to his guilt of the assault, but this is contrary to the authorities. (*People* v. *Zerillo*, 36 Cal.2d 222, 227 [223 P.2d 223] and *People* v. *Teshara*, 141 Cal. 633, 638 [75 P. 338], quoted in the Zerillo case.) At any rate this grievance is no basis for reversal.

Further error is predicated on the court's allegedly permitting the introduction of evidence of other crimes or prac-

tices of the defendants unrelated to any issue on trial.
Evidence of commission of other crimes or degrading acts falling short of crime is as a rule incompetent if not relevant for special purposes. (8 Cal.Jur. 58 et seq., Crim. Law, § 167; *People* v. *Zemavasky*, 20 Cal.2d 56, 62 [123 P.2d 478].)

In this connection appellants complain of evidence regarding a colorable transaction with respect to an antedated Mexican divorce paper as to which Stoner and Brown cooperated in behalf of a client of Brown's. This evidence was contained in Stoner's second confession, his grand jury testimony, his fifth confession and in a statement of Brown, admitted in evidence. Prior to the admission of the last two statements, objections or motions to delete directed to this point were made. However no such objections were made the first two times when such evidence was received. Brown also could then have objected because it was without value for the case against Stoner and prejudicial to him. After this evidence had come in without objection the admission of similar evidence over objection is not so prejudicial as to require reversal. The pretrial statements of Brown in that respect are relevant to corroborate Stoner's confession in general.

Respondent points out correctly that such evidence is admissible if it tends logically, naturally and by reasonable inference to establish any fact material for the People or to overcome any material matters sought to be proved by the defense. (*People* v. *Peete*, 28 Cal.2d 306, 315 [169 P.2d 924]; *People* v. *Hughes*, 123 Cal.App.2d 767, 769 [267 P.2d 376].)

Respondent contends that the evidence was relevant to show an intimate connection between the defendants, relevant in all cases of conspiracy. And with that we agree.

Brown also complains of the admission of evidence as to nightly relations of his with other women, among whom his secretary Dorothy Zentner and especially one Sharon Davis, and as to his ownership of 1181 Clay Street where he and each of the two named women had lived. His relation with other women was relevant to his bad relation to his wife which deserves consideration in the matter of motive. The ownership of 1181 Clay Street is indirectly of importance for his relation to the named women. The house was recorded under the name of Sui Mae Hing. Brown and Miss Zentner contended that a deed in that name was made out by Miss Zentner; handwriting experts testified that the deed was in the handwriting of Sharon Davis. There is no error here.

The questioning of Brown on cross-examination did not bring out more than the text of the grand jury proceedings, already received in evidence, without prejudicial comment and it does not appear that this was for other purposes than general impeachment or that it was prejudicial.

Portions of the district attorney's argument to the jury pointed out as improper and constituting prejudicial error include the following: The frequent use of Stoner's confessions, admitted as against him only, for argument against Brown by comparing Brown's position as to certain events with the one given by Stoner in the confession. This was all within the facts proved, and the argument was not error.

The case is not even close on its facts. The evidence shows a cold-blooded attempt to murder Mrs. Brown so that her husband could acquire a large amount of real and personal property standing in her name. Stoner was merely a weak-minded tool employed by Brown for that purpose. Aside from Stoner's repeated confessions the testimony of other witnesses and the circumstantial evidence discloses the guilt of both defendants unmistakably. Both were given a fair trial and the errors assigned were not prejudicial.

The judgments and the orders denying a new trial are all affirmed.

Dooling, J., and Kaufman, J., concurred.

Appellants' petitions for a rehearing were denied April 5, 1955, and their petitions for a hearing by the Supreme Court were denied April 20, 1955.