[Crim. No. 8444. Second Dist., Div. Four. Nov. 7, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. HOWARD STANTON LEWIS et al., Defendants and Appellants.

[Crim. No. 8439. Second Dist., Div. Four. Nov. 7, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES WILLIAM JONES, Defendant and Appellant.

(Consolidated Cases.)

Thomas W. Cochran, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—The present appeals are from judgments of conviction on a group of charges originally contained in three separate indictments. As a result of proceedings taken in the trial court (and not questioned here) two of the indictments were consolidated and that case ( 244636) was, as to defendant Jones (the sole appellant therein), submitted to the trial court, without a jury, on the transcript of the grand jury proceedings. The other indictment ( 244634) was tried before a jury, resulting in verdicts adverse to appellants. We consider first the appeals from the judgments in the case tried to a jury.

In case No. 244634, appellants, together with other persons not appellants here, were charged in Count I with conspiracy (Pen. Code, § 182) to commit: (a) grand theft auto (Pen. Code, § 487, subd. 3); (b) grand theft (Pen. Code, § 487, subd. 1); (c) kidnapping for the purpose of robbery with injuries inflicted (Pen. Code, § 209); and (d) robbery (Pen. Code, § 211).

Eight overt acts were alleged as having been committed in furtherance of the conspiracies; six alleged the sale or attempt to sell certain stolen automobiles by the use of counterfeit documents; one alleged the forcible entry into a home, assault, robbery and kidnapping of its occupants; one alleged the possession of counterfeit documents by one of the co-conspirators.

140

Counts II, V, VII, VIII and X charged the grand theft of the automobiles involved in six of the overt acts; Counts III, IV, VI, IX and XI charged grand theft in the taking of the money received in the several sales involved in the same overt acts.[1]

The jury found defendants Jones and Lewis guilty of conspiracy to commit grand theft and of conspiracy to commit grand theft auto, as charged in Count I, and guilty as charged in the other counts; it found defendant Brylke guilty of conspiracy to commit robbery, but not guilty as to the other charges. Thereafter, as a result of proceedings in the trial court, prison sentences were pronounced against Brylke on the single charge of conspiracy to rob and against Jones and Lewis on the charges other than the conspiracies to kidnap and to rob.[2] The other charges were dismissed.

*APPEAL BY JONES AND LEWIS IN No. 244364*

I

Jones and Lewis concede that there is sufficient evidence in the record to establish the commission of all of the overt acts which are alleged as part of Count I of the indictment. They also concede that, if they were proved to have been members of the alleged conspiracy, it need not be proved that they had participated personally in the various overt acts. Their contention is that the evidence was not sufficient to prove their membership in the conspiracy.

The testimony of Nancy Dolores Billings, a coconspirator against whom the charges were dismissed, clearly and positively implicated both Jones and Lewis in four of the automobile thefts and sales which were involved in the conspiracy charge and in the sundry substantive counts. In brief, Mrs. Billings testified to her participation in the sales of the stolen vehicles involved in overt acts 1, 2, 5 and 6; that Jones and Lewis either together or separately directed her activities in detail in connection with each of the transactions; in certain instances one or the other would tell her where to pick up a particular car out of a parking lot and where to take it for exchange of license plates and registra-

---

[1] We summarize the details of the eight overt acts, and of the ten substantive counts, in Appendix I, *infra.*

[2] As to Jones and Lewis, sentence was ordered to run concurrently on Count I (conspiracy to commit grand theft auto) with those on Counts II, V, VII, VIII and X, with a consecutive sentence on Count I (conspiracy to commit grand theft) to run concurrently with those on Counts III, IV, VI, IX and XI.

tion certificate and for subsequent sale; she would give the proceeds from the sales to Lewis and Jones together or to one or the other. The contention is that Mrs. Billings was an accomplice and that her testimony was not properly corroborated as required by section 1111 of the Penal Code.[3]

The People meet this contention by arguing, first, that Mrs. Billings was an involuntary participant in the alleged conspiracy and, therefore, not one whose testimony required corroboration. (*People* v. *Westek* (1948) 31 Cal.2d 469 [190 P.2d 9]; *People* v. *Roberts* (1947) 82 Cal.App.2d 654 [187 P.2d 27; *People* v. *Battilana* (1942) 52 Cal.App.2d 685 [126 P.2d 923].) They base this contention on the fact that Mrs. Billings testified that she protested against selling any stolen cars after defendant Lewis disclosed to her that the first car she sold for him was stolen; that he then threatened her by stating she would sell more automobiles for him when requested to do so if she knew what was good for her, and that she better not go to the police if she knew what was good for her.

We do not believe this evidence is sufficient to make Mrs. Billings an involuntary participant in an alleged crime. The threatened danger must be an immediate danger; a fear of *future* harm to one's life does not relieve one of responsibility for the crimes he commits. (*People* v. *Otis* (1959) 174 Cal.App.2d 119, 125 [344 P.2d 342].) At most, Mrs. Billings' testimony reveals a threat of future bodily harm if she did not cooperate with Lewis.

*Corroborating Evidence As To Lewis*

 William D. Andrews, Special Agent for the Federal Bureau of Investigation, obtained a search warrant from the United States Commissioner with regard to premises at 10392 Florence Avenue, Cypress, Orange County. The day before Agent Andrews obtained the search warrant, Robert Michener, Deputy Sheriff of Los Angeles County, accompanied by his partner, Officer Bensuka, observed Mrs. Billings arriving at these premises and being admitted by defendant Lewis. Mrs. Billings testified that she visited Lewis at this residence and he told her that it was his residence.

In his search of the premises, in cooperation with the Los

[3]Pen. Code, § 1111 provides in part: ''A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.''

Angeles County Sheriff's Office, Auto Theft Detail, Andrews observed and discovered, among other things, a fully equipped photographic dark room, a speed-graphic camera, a light bar with four lamps, another camera, a device known as an interval camera, a tripod for the light bar, five photographic copies of drivers' licenses designated as operator's No. W444838 (this license bore the name David Farrell, whose name was used by a coconspirator, Alvin Bert Dillard, in selling two cars, alleged in the indictment as overt acts 3 and 7 in furtherance of the conspiracy), a white cardboard approximately 5 x 7. Taped to the cardboard were two strips, the top one reading ''California License,'' and the bottom strip marked ''Must be carried when operating a motor vehicle and when applying for renewal,'' an envelope containing nine blank certificates of ownership for an automobile for the State of California, a completed certificate of ownership to a 1959 Cadillac (this automobile was stolen from Leo R. Walker, and is one of the acts alleged to be in furtherance of the conspiracy), Kelly Blue Book, Auto Market Report. Also found was a rubber stamp bearing the Great Seal of California, other date stamps, India Ink, a pen and two pen points, an IBM typewriter,[4] a paper cutter, a photograph of Mrs. Billings (which she testified is a photograph she had had taken at Lewis' request, had given to him, and which apeared on a counterfeit license in the name of Betty Ann Miller, which she used as identification in making sales of stolen cars) and personal identification belonging to David Farrell.

Arthur J. Fitzpatrick, Supervising Special Investigator for the Department of Motor Vehicles, an expert in questioned ownership and registration certificates, testified that the pink slips used in the automobile transactions and those uncovered in the search of the premises occupied by Lewis were made from the same lithoplate.

William L. Bowman, an expert in examining questioned documents with the Los Angeles County Sheriff's Department, testified that, in his opinion, the type on the license in the name of Betty Ann Miller (which was taken in the search conducted by Agent Andrews) was from the Remington typewriter identified as belonging to Lewis, and the pink slip

---

[4]Mrs. Billings testified in detail as to Lewis' possession of an electric typewriter, that he had, in her presence, taken it to a shop for repair, receiving a ''loaner'' typewriter in exchange. The typewriter found in the house was identified as this ''loaner.''

involved in one of the stolen car transaction was typed on the IBM typewriter found in the search of Lewis' house.

Harold R. Treichler, Deputy Sheriff of Los Angeles County, assigned to the photo laboratory in a supervisory capacity, had devoted his attention to photographing or creating documents by photographic processes over a period of many years. He inspected pictures depicting the photographic work room in the house where Agent Andrews conducted his search. Mr. Treichler was of the opinion that the equipment and arrangements suggested an adequate copy and darkroom setup. A copy setup is designed to duplicate whatever may be set up in front of the camera. Items such as the birth certificate and license, found by Agent Andrews, could have been created with use of such equipment. It was also possible, through composite photography, using the items taken in Agent Andrews' search, to create facsimiles of California driver's licenses.

This sampling of the evidence corroborating Mrs. Billings' testimony as to Lewis' participation in the crimes adequately demonstrates that it was not only substantial but overwhelming.

*The Corroborating Evidence As To Jones*

 Jones testified that he knew Lewis during the period when the alleged conspiracy was to have taken place. The owner of the Pioneer Bowl testified that Jones and Lewis were frequently seen together at the Pioneer Bowl and would meet each other there.

Jones admitted that a counterfeit California Driver's License in the name of Abe Bert Warner belonged to him. An expert witness for the state testified that the stamp of The Great Seal of California on the back of the Abe Warner license came from the rubber stamp found during the course of the search by Agent Andrews.

While on the stand, Jones was asked to make exemplars of his handwriting. Donn Mire, an expert on questioned documents, testified for the People that he compared Jones' handwriting with applications for substitute license plates in the name of Morris Switzer and Lawrence E. Wells; that the writing on these applications were in a disguised handwriting and that defendant Jones was capable of writing them and possibly did so, and, while it was possible for someone else to have written this material, it was not probable.

Morris Switzer and Lawrence E. Wells both testified that

they did not make the applications in question.

The license obtained pursuant to the forged Morris Switzer application was used on the automobile that defendant Alvin Bert Dillard sold to Osborn Used Car Company. (Overt Act No. 3.)

The license obtained pursuant to the forged Lawrence E. Wells' application was used on the Buick (Wells' car was a Valiant) sold to Steffy Buick Co. by Mrs. Billings.

 Corroborating evidence is sufficient if it tends, in some slight degree at least, to implicate the defendant; it need not be strong. (*People* v. *Follette* (1925) 74 Cal.App. 178 [240 P. 502].) Nor does the testimony of the accomplice have to be corroborated by direct evidence. Circumstantial evidence suffices for the purpose of corroboration if it tends to connect defendant with the commission of the crime. (*People* v. *Wayne* (1953) 41 Cal.2d 814 [264 P.2d 547].)

 Tested in light of these prevailing principles, there is substantial evidence corroborating the testimony of Mrs. Billings to connect Jones with the conspiracy as contemplated by section 1111 of the Penal Code.

## II

Defendants Jones and Lewis further argue that the trial court committed prejudicial error in the admission of evidence.

 (a) Jones complains of the introduction of the testimony of Janette Miguel because it pertained to events subsequent to the alleged conspiracy. Mrs. Miguel testified as to a conversation between Jones and an alleged coconspirator, Islar. While mere association with the perpetrator of a crime is not sufficient to prove a criminal conspiracy (*People* v. *Massey* (1957) 151 Cal.App.2d 623 [312 P.2d 365]), the entire conduct of the parties, their relationship, acts, and conduct, during and after the crime, may be taken into consideration by the jury in determining the nature of the conspiracy. (*People* v. *Lopez* (1963) 60 Cal.2d 223 [32 Cal.Rptr. 424, 384 P.2d 16] ; *People* v. *Williams* (1954) 128 Cal.App.2d 458 [275 P.2d 513] ; *People* v. *Kobey* (1951) 105 Cal.App.2d 548 [234 P.2d 251].) The evidence had some probative value and its admission was not prejudicial.

(b) Jones contends that the testimony of Clifford E. Johnson relative to the transaction involving the IBM and Remington typewriters was inadmissible against him because there was insufficient evidence against him of conspiracy to

make this testimony admissible. We cannot agree. As we pointed out, the testimony of Mrs. Billings was adequately corroborated to connect Jones to the conspiracy. Therefore this testimony was admissible as to defendant Jones.

(c) Jones also contends that the testimony of Special Agent William D. Andrews was inadmissible as to him. However, his testimony as to the articles discovered by him pursuant to the search had probative value in linking Jones to the conspiracy to commit grand theft auto and grand theft as charged in Count I.

(d) Defendants Jones and Lewis claim that the testimony of Ackerman, Foscarini and Pilkinton regarding conversations with defendant Jimmie Miller pertaining to the attempted sale of an automobile in Las Vegas, Nevada (Overt Act No. 8) was inadmissible against them because there was no evidence to connect them with any of the counts. Defendants seem to have overlooked the testimony of Investigator Fitzpatrick of the Department of Motor Vehicles to which we have previously referred and which connected Miller with the conspiracy to commit grand theft auto.

(e) Jones claims that the testimony of Frank Perrone, a bartender at the Pioneer Bowl, was not relevant to the charges before the court and created prejudice in the jurors' minds, thus preventing him from having a fair trial. There is no merit in this contention.

(f) Jones and Lewis contend that certain evidence was obtained as a result of an unlawful search and seizure. The issue of unlawful search and seizure was presented to the trial court and it determined that the search was valid as an incident to a lawful arrest. There was no error in this finding.

(g) Jones and Lewis next contend that evidence of other crimes was improperly admitted. This testimony was relevant to the charge of conspiracy to commit robbery, tending to show a common plan or scheme. Furthermore a mistrial was declared as to Jones and Lewis regarding the charge of conspiracy to commit robbery, and that charge was ultimately dismissed. We cannot find any resulting prejudice from the introduction of this evidence. The record is so replete with other, clearly admissible evidence as to the criminal background and character of these defendants that no further derogation of their character could have been accomplished by the evidence herein involved.

### III

█ Lewis and Jones further contend that their constitutional rights were violated when the court, over objection, compelled a codefendant to take the stand as a witness against his codefendants. Even if the court erred in compelling a witness to testify where that witness could refuse to testify because he was a codefendant, it was not an error committed as against Jones and Lewis, and therefore not a matter of which they can complain. (*People* v. *Mann* (1957) 148 Cal.App.2d 851 [307 P.2d 684] ; *People* v. *Judson* (1933) 128 Cal.App. 768, 773 [18 P.2d 379] ; *People* v. *Leavitt* (1932) 127 Cal.App.394 [15 P.2d 894].)

█ Moreover, since this testimony was directed toward Jones and Lewis regarding the charges of conspiracy to commit robbery and conspiracy to kidnap, which charges were later dismissed, no prejudice resulted.

We have carefully examined the remainder of defendants Jones' and Lewis' contentions and find that no prejudicial error was committed.

### *APPEAL BY BRYLKE IN No.* 244634

█ Defendant Brylke was convicted only on the charge of conspiracy to commit robbery. Brylke concedes that the evidence was sufficient to show proof of the robbery, and that he participated therein. However, he contends that Los Angeles County was not the proper venue for purposes of trial because none of the overt acts in furtherance of the conspiracy occurred in Los Angeles County. (Pen. Code, §§ 182, 184 and 781.)

Much of the evidence of the conspiracy to commit robbery is reflected in the testimony of a codefendant, Seals, against whom the charges were dismissed. His testimony relating to the conspiracy to rob the Farrells is in substance as follows: He and defendant Brylke went to Jones' house in Los Angeles. Prior to this time Brylke did not know Jones. From Jones' house, he, Jones and Brylke went to a bar. Seals believed that this bar was somewhere in Los Angeles County, but was not sure of its exact location. It was at the bar that Jones told Seals that he knew a man who had $80,000 and wanted to know if Seals wanted to "score." "Score" means to rob someone. All during this conversation Brylke was present. Seals agreed to do the job and Brylke then said that he would go with Seals if he, Seals, wanted to go and do the "job." After this meeting, which was about 6 p.m., Seals Jones and Brylke drove to a bar a few miles from the Farrell

home. It was stipulated that the Farrell home was in Orange County. Seals testified that he did not know whether the bar to which they drove from the one where they initially met was in Los Angeles or in Orange County. On the way to this bar Jones pointed out the house they were to rob in Orange County. At the second bar Jones gave Seals the telephone number of the bar and told Seals to call him when they got in the Farrell house and tell him what was happening. They arrived at the bar about 8 p.m. that same evening. Seals and Brylke then left Jones for the Farrell house. After robbing the Farrells, he and defendant Brylke met Jones at the second bar. The three of them drove to some house, the location of which Seals was not sure of. At the house Seals dumped the "loot" from the robbery onto the garage floor. Seals and Brylke took the money, and Jones said he would get rid of the other "junk" and that he would split any money that he would get for the loot with Seals and Brylke at a later date. Then he, Jones and Brylke drove to the Pioneer Bowling Alley (in Los Angeles). Brylke then remembered that he had left a Beretta pistol, which he had taken in the Farrell robbery, in the car and went back to get it. Seals and Brylke then drove back to Hollywood.

A few days later he and Brylke once again met Jones at the Pioneer Bowling Alley where Jones gave Seals and Brylke $400 for the loot from the Farrell robbery.

Although Seals testified that he was not sure of the exact location of the bar in which the robbery of the Farrells was initiated, the verdict of guilty carries with it the implied finding that such bar was in Los Angeles County. It is for the jury to determine the credibility of a witness and the weight to be given to the testimony of an individual witness, even if inconsistent. (*People* v. *Mason* (1955) 130 Cal.App.2d 533, 535 [279 P.2d 621]; *People* v. *Thomas* (1951) 103 Cal.App.2d 669, 672 [229 P.2d 836].) And, on appeal from a judgment of conviction, that portion of the testimony of a witness which supports the judgment must be accepted. (*People* v. *White* (1951) 115 Cal. App.2d 828 [253 P.2d 108].)

Moreover, where an act requisite to the ends of an unlawful purpose is continuous, such as driving from one county to another, either county has jurisdiction for trial of the conspiracy. (*People* v. *Buono* (1961) 191 Cal.App.2d 203, 223 [12 Cal.Rptr. 604].) Such is the case here.

In addition, the final division of the proceeds of

the robbery took place in Los Angeles County when, as we have recounted, Jones met Seals and Brylke at the Pioneer Bowling Alley and gave them their share of the sale price of the loot. ■■■ It is well settled that a conspiracy to rob or to steal continues until the spoils have been divided. (*People v. Brown* (1955) 131 Cal.App.2d 643, 656 [281 P.2d 319]; *People v. Ross* (1941) 46 Cal.App.2d 385, 395 [116 P.2d 81]; *People v. Dean* (1924) 66 Cal.App. 602, 608 [226 P. 943].) ■■■ This act of final division was, of itself, sufficient to place venue in Los Angeles County.

The other points raised by Brylke are the same as some of those raised by Jones and Lewis, heretofore discussed and found to be without merit.

### APPEAL BY JONES IN CASE No. 244636

■■■ We turn now to the appeal by Jones from his conviction on the other indictment. Insofar as now involved, this indictment charged Jones, together with Lewis, Vernie Monroe Hudgins, and others, with burglary of a store in Santa Monica on April 22, 1961. The trial court found Jones guilty as charged, denied probation, and sentenced him to prison for the term prescribed by law—the sentence to run concurrently with the sentences imposed under case No. 244634.

Jones does not dispute the proof of the burglary, but contends that his connection with the burglary was not established.

Admittedly, defendant Jones was not found at the scene of the burglary. The theory of his connection with the burglary is that he aided and abetted, or conspired with, his codefendants to commit the substantive offense charged. The evidence which is relied on to prove Jones' connection with the burglary was as follows:

(1) That Jones knew defendants Hudgins and Lewis;

(2) That Hudgins and Lewis were involved in at least one other burglary together;

(3) Evidence connecting Jones to a series of burglaries, thus allegedly tending to show a common plan or scheme on the part of Jones to commit burglary;

(4) A wheel-puller used in opening safes was found at the scene of the J. J. Newberry burglary. Defendant Jones admitted having invented the adaptation of a wheel-puller for opening safes, and in one of the burglaries to which Jones was linked a wheel-puller may have been used to open a safe;

(5) A mallet was found at the scene of the burglary, and a chemist testified for the People that the residue found in a

smelting pot at Jones' residence was similar in chemical composition to the metal in the head of this mallet and could have come from the same batch.

 A judgment will not be reversed for insufficiency of evidence if there is substantial evidence supporting the inference of guilt. (*People* v. *Kross* (1952) 112 Cal.App.2d 602, 610 [247 P.2d 44].) And an inference based on another inference is permissible if not too remote or conjectural. (*People* v. *Vignoli* (1963) 213 Cal.App.2d 855, 857 [29 Cal.Rptr. 260].) Nor may a conviction be set aside because evidence is susceptible of two reasonable inferences, one looking to guilt and another to innocence. (*People* v. *Reed* (1952) 38 Cal.2d 423, 431 [240 P.2d 590].)

On the other hand, where the evidence merely raises a suspicion of guilt of the person charged with the crime, it is insufficient to sustain the verdict against him. (*People* v. *Rascon* (1954) 128 Cal.App.2d 118 [274 P.2d 899].) Such is the case here. Apart from the evidence as to the wheel-puller and mallet, the record shows only that Jones might have conspired with his friends, not that he had done so. We are not told that the wheel-puller used in this burglary was, in fact, the property of Jones or made by him; it may as well have been made by someone else infringing on Jones' "patent" adaptation. We do not know how common is metal of the chemical composition found in the mallet head and in Jones' pot, nor whether, speculating that the mallet head had been made in Jones' pot, it had not been "borrowed" by Hudgins or Lewis without permission, or loaned or sold to one of them by Jones for some purpose quite disconnected with the Newberry burglary. A conviction based on such pure speculation and guess-work cannot stand.

The judgments in 2d Crim. 8444 are affirmed; the judgment in 2d Crim. 8439 is reversed.

Burke, P. J., and Jefferson, J., concurred.

## APPENDIX 1

The eight overt acts alleged were as follows:

(1) Approximately on March 31, 1961, Nancy Dolores Billings, using the name Betty Ann Miller, and a counterfeit California certificate of ownership and identification in that name, offered to sell, for $2,400, to Norman Isaacs, sales manager of Browning Oldsmobile Company, a 1960 Oldsmobile convertible stolen from Joan Gould.

(2) Approximately on April 3, 1961, Nancy Dolores Billings, using such means, did sell this automobile to Morris H. Shuff and Gordon Bolton, employees of Nowling Oldsmobile Company, in such amount.

(3) Approximately on April 12, 1961, Alvin Bert Dillard, using the name David Farrell and a counterfeit California certificate of ownership in that name, sold, for $3,000, to John W. Osborn, owner of Osborn Motors, a 1959 Cadillac convertible, stolen from Capp Drilling Company, Inc.

(4) Approximately on April 2, 1961, Richard Seals and appellant Brylke forcibly entered the residence of David Farrell at 10341 Ladera Senda, Santa Ana, at gunpoint, beat the Farrells, removed jewelry belonging to Mrs. Farrell from the safe inside the residence at gunpoint, forced the Farrells and their children to move to various parts of the house against their will, and took all the personal identification of the Farrells.

(5) Approximately on April 11, 1961, Nancy Dolores Billings, using the name Betty Ann Miller and a counterfeit California certificate in that name, sold, for $2,050, to Merle Wernick, sales manager of Steffy Buick Company, Orange County, a 1960 Buick stolen from Harold O. Thomsen and/or Helen Moffitt.

(6) Approximately on April 14, 1961, Nancy Dolores Billings, using the name Betty Ann Miller and a counterfeit California certificate in that name, sold, for $2,300, to Thornton H. Cox, an employee of Community Motors Company, a 1960 Pontiac, stolen from Charles Apperson.

(7) Approximately on April 14, 1961, Alvin Bert Dillard, using the name David Farrell and a counterfeit certificate of ownership in that name, sold, for $2,400, to Raymond Goodman, manager of Orrin W. Fox Company, a 1960 Oldsmobile stolen from Mildred F. Inman.

(8) Approximately on April 24, 1961, Jimmie L. Miller was arrested in Las Vegas, Nevada, and had in his possession two counterfeit California certificates.

Count II charged the same defendants with feloniously taking a 1960 Oldsmobile convertible, 1961 California license number SXS 974, the personal property of Joan Gould. (This is the automobile involved in Overt Acts Nos. 1 and 2 above.)

Count III charged the same defendants of attempted grand theft in that they feloniously attempted, on or about March 31, 1961, to take $2,400, the personal property of

Browning Oldsmobile Company and Norman Isaacs. (This was Overt Act No. 1 above.)

Count IV charged the above named defendants with grand theft in that they did take wilfully, unlawfully and feloniously, $2,400, being the personal property of Nowling Oldsmobile Company, Morris H. Shuff, and Gordon Bolton. (This was Overt Act No. 2 above.)

Count V charged the same defendants, with the exception of Alvin Bert Dillard, of grand theft auto, in that on or about April 6, 1961, the defendants did unlawfully and feloniously take a 1959 Cadillac convertible, 1961 California license number RTT 023, the personal property of Capp Drilling Company, Inc., and Clinton Albert Petrie. (This was the automobile involved in Overt Act No. 3 above.)

Count VI charged the defendants, with the exception of Alvin Bert Dillard, with grand theft in that on or about April 12, 1961, they feloniously took $3,000, the personal property of Osborn Motors and John W. Osborn. (This was Overt Act. No. 3 above.)

Count VII charged the defendants with grand theft auto, in that they feloniously took a 1960 Buick automobile, 1961 license number STA 383, the personal property of Harold O. Thomsen and Helen Moffitt. (This was the automobile involved in Overt Act No. 5.)

Count VIII charged the defendants with grand theft auto of a 1960 Pontiac, 1961 California license number UBB 215, the personal property of Charles Apperson. (This was the automobile involved in Overt Act No. 6 above.)

Count IX charged defendants with grand theft in that they feloniously took $2,300, the personal property of Thornton H. Cox. (This was Overt Act No. 6 above.)

Count X charged defendants with grand theft auto of a 1960 Oldsmobile, 1961 California license number TYP 947, the personal property of Mildred F. Inman. (This was the automobile involved in Overt Act No. 7 above.)

Count XI charged defendants with grand theft of $2,400, the personal property of Orrin W. Fox Company and Raymond Goodman. (This was Overt Act No. 7 above.)