[Crim. No. 4771. Second Dist., Div. Two. Aug. 8, 1952.]

THE PEOPLE, Respondent, v. SIDNEY KROSS, Appellant.

Morris Lavine and Edward R. Brand for Appellant.

Edmund G. Brown, Attorney General, and Stanford D. Herlick, Deputy Attorney General, for Respondent.

FOX, J.—Defendant was charged with two counts of grand theft and two counts of burglary. The jury found him guilty as charged, finding that the burglaries were of the second

degreee. Defendant's motion for a new trial was denied; his application for probation was also denied, and he was sentenced to the state penitentiary. He appeals from the judgment of conviction and the order denying a new trial.

This case involves defendant's entry of two fur stores with the alleged intent to steal expensive furs and his alleged success in perpetrating the thefts. On the morning of February 15, 1951, at about 11:40 a. m., defendant entered the office of Robert Walsh, a wholesale fur dealer, located in the Bankers Building at 629 South Hill Street, Los Angeles. Although the weather was warm, defendant was wearing an overcoat. Mr. Walsh was in the showroom displaying furs to some customers. Mr. Walsh's brother was also there. A telephone call was received for Mr. Walsh and as he finished the telephonic conversation he walked to the entrance of his secretary's office and observed the defendant, whom he had never seen before, walk out of the shipping and receiving room. Defendant looked at Walsh and continued walking to the office of the secretary who was at her desk. The secretary looked up and observed defendant counting bills. He identified himself by the name of Feinberg, stating he was waiting for his wife. An invitation to be seated was declined with the statement that he preferred to stand. The secretary, however, insisted, escorting him to a chair in her office where he sat for a few moments. Soon, defendant stated that he desired to have a cup of coffee; that he was expecting his wife between 11:45 and 12; that if she appeared while he was gone, to have her wait for him. The secretary did not actually see him depart from the premises, but she never saw him again.

Walsh's fur vault was centrally located in relation to the showroom and the shipping and receiving room, with entrances equipped with steel doors leading into both rooms. These doors were kept open during business hours. Furs were shown to customers only in the showroom, and Walsh never allowed a customer to enter the vault in which all his furs were kept. There were only two ways in which the vault could be entered, either through the showroom or from the hallway through the shipping and receiving room.

It took Walsh about 25 minutes to serve his customers, after which he went into the vault and noticed several items missing. Walsh, his brother, and his secretary immediately took inventory, which was just a few minutes after defend-

ant's departure. Two Breath of Spring Mink cape stoles and a set of Stone Martens, consisting of four pelts, were found missing. The color of these furs was described as a blue somewhat lighter than slate. Walsh had last seen these furs when he arranged his stock that morning at about 10 a. m. Reference to his records disclosed that these furs had not been sold, and that they were still listed in the inventory, which his secretary had compiled the previous day. No woman identifying herself as Mrs. Feinberg ever appeared.

At about 12:50 in the afternoon of the same day, defendant entered the office of the Giba-Friedman Fur Company, located in the Spreckels Building, one block south of the Bankers Building on the same street. At that time a salesman and the bookkeeper were the only persons on duty. Defendant asked for Mr. Bertz, the salesman, who, however, had never seen defendant before. Defendant inquired whether his wife, "Mrs. Lawine," had arrived. The salesman replied that she had not and suggested defendant have a seat and wait for her. He also suggested defendant remove his top coat because the latter was perspiring very profusely. Defendant declined, stating, as he mopped his brow, that he did not feel well and that his wife was due about 1:15. During the next few moments Bertz noticed that defendant sat on a couch, arising occasionally to pace the floor and look down the firm's hallway. He also noticed that the top coat worn by defendant seemed too large.

Mrs. Buckhout, a customer, was seated in the waiting room at a point from which she could see the 8-foot drapes which hung over the doorway of the firm's storage room. She observed defendant pacing the room several times and on one occasion looking behind the drapes, where he suddenly disappeared. He came out again after about five to eight minutes. Mrs. Buckhout expressed a desire for some lunch and defendant offered to get some tea for her. Bertz told him that would not be necessary, as one of the other salesmen could get it for her. Defendant then stated that if his wife showed up she could purchase anything she wanted and he would send the money. He thereupon took his departure still wearing his top coat. No woman named Lawine or of any similar name ever made an appearance at the fur salon.

The company kept its furs in the storage room. The next morning at 9:15 a check of the inventory was made and it was found that a Silver Blue Mink stole and a Ranch Mink

stole were missing, both of which were in the vault on the previous day. Neither of these furs had been sold.

After defendant left the premises of the Giba-Friedman Fur Company he went to the offices of Bachelis Furs, located in the Cutts Building at 706 South Hill Street, Los Angeles. He arrived there about 3 p. m. An employee named Weinstein, who had never seen defendant before, noticed that he was wearing a brown top coat in spite of its being a "hot and humid day." Defendant asked for a black Russian Broadtail jacket. He was advised they did not have any on hand but if he would return the next day they would have them. Without, apparently, knowing the name of the salesman, defendant gave his own name as "Weinstein."

On the next morning Walsh* had occasion to go to the Cutts Building, which was located about half a block from the Bankers Building. He took the elevator to the seventh floor. After a few minutes he returned to the elevator, and, as he pushed the button, the elevator door opened and out stepped defendant. Walsh followed defendant into the Bachelis Fur establishment where the latter again contacted the salesman Weinstein regarding the Broadtail jacket, and was advised that they had not yet been brought in. Weinstein observed defendant wore the same garb as on the day before although it was also a warm day. Finally, defendant stated he would be back later, and made his exit. As he left, he looked in Walsh's direction. Walsh followed him to the hallway but failing to see him, took the elevator to the lobby of the building. Weinstein also followed defendant. Walsh waited for a short time and finally defendant appeared, coming down the stairway into the main lobby. Walsh approached defendant and told him that he had been in his office the day before and asked him his name. Defendant gave the name of "Levine." At this point Walsh and salesman Weinstein left to contact a traffic officer. Bertz, the salesman of the Giba-Friedman Company, happened by the Cutts Building about that time and recognized defendant, who had started south on Hill Street. Bertz engaged him in brief conversation regarding his contemplated return with his wife to purchase a fur. Defendant then continued on his way at a rapid pace.

Walsh and Weinstein returned with the uniformed officer.

---

*Walsh is the wholesale furrier in the Bankers Building; Bertz is the salesman of Giba-Friedman in the Spreckels Building.

The officer called to defendant several times but the latter gave no heed and kept on walking rapidly. The officer and the three furriers chased defendant down the street, the officer half trotting to try to catch up with him. Defendant crossed the street in the middle of the block. The officer whistled at him a number of times to halt. Defendant did not stop but kept on, half running and half walking, and entered the Jewelers Building. Arriving there the officer not seeing defendant in the lobby walked to the elevator but could not find him. He then looked around a partition separating the elevators and the stairway, and discovered defendant standing at the first landing of the stairs looking down at him. He called to defendant to come down telling him he wanted to talk to him, but instead defendant proceeded on up the stairway. When the officer apprehended him on the second floor, he said his name was "Kay." He then sought to secure his release by twice offering money to his captor.

On the way to the police station one of the transportation officers asked defendant his name, to which he replied, "Samuel Koenig." When asked for his address defendant stated he had just arrived from New York and Chicago and gave his local address as Flower Street, but when the officer started to take defendant to that address he admitted he did not live there. He then gave an address in Chicago as his residence. He claimed to have arrived in Los Angeles on a plane which left Chicago at 6:30 a. m. on February 15th and arrived in Los Angeles at 1:15 p. m.

Defendant's trousers were removed. Suspenders were attached to the pants but no belt. On the inside of the trousers the officer noticed an inset with several hairs clinging to it. His socks were also taken for examination.

Defendant's waistline was found to be 50 inches. The waistband of his trousers measured 60 inches, and the inset 14 inches at the widest point. Defendant's clothing was turned over to a police chemist who, upon examining them, extracted numerous hairs. Hair was found on the inside of both trouser legs, in the crotch, in the rear part of the trousers, in the trouser cuffs; also inside defendant's suit coat, and in his socks. These hairs were placed in glass vials marked according to the place in the clothing from which they were taken. At least 35 hairs were found on the inside of the trousers. Known fur samples were brought to the chemist by an officer who had obtained them from the fur

dealers, including Ranch Mink, Stone Marten, Silver Blue Mink, Breath of Spring Mink, and Silver Fox. Specimens from both sources were mounted on slides, marked according to source. The chemist compared the hairs from defendant's clothing with the known samples by means of a microscope. Further comparisons were made of hair taken from a cat, a rabbit and a squirrel. The chemist found there was a great similarity between some of the hairs taken from defendant's clothing and the mink hair on the known samples; some of the hairs very closely resembled the sample marked "Ranch Mink." The hairs taken from the pants could not have come from a dog, cat, squirrel or rabbit; neither could they have been from the material of defendant's pants. According to Mr. Walsh, who had been in the fur business for over 20 years, a new mink garment will shed hairs loosened in the cutting and assembling of the garment.

Defendant did not take the stand. He did, however, produce a fur expert of many years' experience, from New York, who was critical of the police chemist's mounting of the hairs on the slides, and because of this alleged faulty mounting was not able to make comparisons. He did, however, find two hairs which had been dyed. He could observe a bluish tinge or cast on two or three hairs taken from inside defendant's pants. Also, he was able to determine that several other hairs found in defendant's trousers came from fur-bearing animals, two of which were light brown in color. The weather bureau report disclosed the maximum temperature on February 15th was 69 degrees, and on February 16th, 63 degrees.

Defendant's first contention is that the evidence is insufficient to support the verdicts. ▮ He first urges that the evidence fails to prove the corpus delicti. The proprietors of the two fur establishments and their employees had determined that certain furs were in stock just prior to defendant's arrival at their respective places of business. Shortly after his departure, the described furs were missing; they had not been sold; and the proprietors had given no one permission to take them from the storage vaults. Thus the corpus delicti was amply established in each case. (*People* v. *Dodson*, 77 Cal.App.2d 389, 394 [175 P.2d 59]; *People* v. *Owens*, 98 Cal.App.2d 485, 486-487 [220 P.2d 575].)

It is next contended that the evidence of defendant's connection with the thefts was not sufficient; that nothing more

than strong suspicion of his guilt was shown; that the evidence was as consistent with innocence as with guilt. ▮ Whether the evidence is as compatible with innocence as with guilt was a question for the jury and not for this court. (*People* v. *Allen*, 104 Cal.App.2d 402, 412 [231 P.2d 896]; *People* v. *Kendall*, 111 Cal.App.2d 204, 212 [244 P.2d 418].) ▮ An appellate court will not review the evidence beyond the point of scrutinizing the record to determine whether there is substantial evidence that supports the inference of guilt. ▮ The judgment will not be reversed unless it can be said that it is not supported on any reasonable hypothesis. (*People* v. *Todd*, 91 Cal.App.2d 669, 670 [205 P.2d 453]; *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].) Defendant lays emphasis on the fact that no one saw him take the furs in question, and that they were not found in his possession. ▮ Direct proof of burglary and theft is not necessary; they may be proved by circumstantial evidence. (*People* v. *Goodall*, 104 Cal.App.2d 242, 247 [231 P.2d 119]; *People* v. *Owens, supra; People* v. *Johnson*, 99 Cal.App.2d 717, 724-725 [222 P.2d 335]; *People* v. *Barrow*, 62 Cal.App.2d 590, 594 [145 P.2d 42].)

▮ As to defendant's connection with the alleged offenses the record discloses in detail the evidence supporting the factual statement already recited. His continual adherence to loose-fitting garments, his reappearance in a top coat in spring weather, his two attempts to bribe the arresting officer, his use of fictitious names in presenting himself to his victims, his uniform manner of gaining entrance into the storage rooms, his thrice repeated statement that he had come to meet his wife to select a fur, his flight in the face of accusations, his prevarication concerning the date of his arrival in Los Angeles, and the discovery in his pants of hairs from furs—all these furnish substantial proof of his guilt. (*People* v. *Newland, supra,* p. 681; *People* v. *Cooper,* 81 Cal.App.2d 110, 117 [183 P.2d 67].)

The weight to be given the evidence was for the jury. It justifies an inference of defendant's unlawful entries and his asportation of the furs. The persuasiveness of this inference is accentuated by defendant's failure to testify. Here were incriminating circumstances. ▮ He alone knew how these hairs from fur-bearing animals came to be on the inside of his pants and in his socks. His failure to explain or deny this incriminating evidence supplied additional support for inferences unfavorable to defendant as to the source of such

hairs. (*People* v. *Adamson*, 27 Cal.2d 478, 490-491 [165 P.2d 3] ; *People* v. *Steccone*, 36 Cal.2d 234, 239 [223 P.2d 17].) It cannot, therefore, be fairly said that defendant's conviction is based upon mere suspicion or that it is lacking in substantial evidentiary support.

 Defendant's second point is that the court erred in failing to grant a mistrial. This contention is based on the conduct of certain photographers in their attempt to photograph the defendant in the court room at a time when the court was not in session but four jurors were in the jury box. Defendant was seated at the counsel table with his head down and with a handkerchief over his eyes. The photographers took pictures of defendant against his will. They tried to get him to expose his face; also, to have his picture taken with his oversize pair of pants. In support of his motion for a new trial based upon this incident defendant filed an affidavit in which he charged the photographers, in substance, with making the following comments: "Come on. Let's take your face and your baggy pants together. What are you hiding your face for? . . . Lift it up and let's take a picture of you. What is the matter with you? The jury will think you are guilty. These pictures of you hiding your face won't do you any good with the jury. Let's see your face."

The trial judge was immediately notified of this occurrence and upon reconvening court admonished the jury that the guilt or innocence of defendant was to be decided only upon the evidence introduced during the trial of the case and from no other source whatsoever, and further admonished them that "whatever any of you may have seen this morning is not evidence in this case; it is not to be considered by you in any way, shape or nature in deciding the issues which will be ultimately presented to you in this case."

The motion for a mistrial was thereupon denied. This incident is also used as one of the grounds on the motion for a new trial which was denied. The rule regarding such situations is stated as follows in 66 Corpus Juris Secundum, section 51, page 165: "A new trial ordinarily will not be granted because of remarks about the case, made during the trial to jurors, or in their hearing, by strangers to the litigation, where neither the successful party nor the jurors were at fault, unless such remarks probably influenced the verdict."

 While the conduct of the photographers was an unfortunate occurrence there is no showing of prejudice which

cannot be assumed where neither the trial court nor the prosecutor was involved, and where the court admonished the jury to disregard the occurrence, calling the jury's attention to their duty to consider only the evidence admitted in the case. The trial court had an opportunity to consider the likely effect of this occurrence upon the jury and the likelihood of prejudice resulting to the defendant. His rulings on both occasions are to the effect that no prejudice was shown. These determinations by the trial court are determinative on appeal in the absence of a clear abuse of discretion. We find no such abuse.

In *People* v. *Pyle*, 44 Cal.App. 130, 133 [185 P. 1019], "defendant filed two affidavits wherein it was stated that one Doyle had stated to defendant's attorney, outside the courtroom, and in the presence of some of the jurors, that he, Doyle, would 'fix' defendant; that defendant beat him out of some money, and that for what defendant's attorney had done, he Doyle, would have defendant arrested." In commenting on this situation the court said, "This, if true, was reprehensible; but in the absence of a showing that such alleged statements influenced the verdict of the jury we think it was not an abuse of discretion to deny defendant's motion" for a new trial.

In *People* v. *Currie*, 3 Cal.App.2d 31, 33 [39 P.2d 215], it appeared from the testimony taken upon the hearing of defendant's motion for a new trial that "during the pendency of the trial, on an occasion when the jurors were leaving the courtroom following an adjournment, two or more of them were accosted by a person who as a witness for the prosecution had testified that she purchased stock in the company respecting which it was alleged that defendant had made false representations. This person stated to said jurors that she hoped the jury 'would be good to them' and would 'give us a square deal,' and that she was a widow 'and had lost her money.' None of the jurors replied. There was testimony that the trial judge was advised of the incident previous to the submission of the cause to the jury, and also that counsel for the defendant did not learn of it until after the verdict had been returned and the jury discharged." The defendant then contended the court erred in not admonishing the jury to disregard these remarks, and that the making of such remarks, plus the failure to give an appropriate admonition, entitled him to a new trial. The court held that while the trial court might properly have admonished the

jurors to disregard the statements, it could not say the error, if any, was prejudicial or the refusal of a new trial was an abuse of discretion. These authorities furnish clear support for the action of the trial court.

In the space of one-half a typewritten page in his brief, wholly devoid of any reference to the transcript, defendant contends that the court erroneously refused to permit him, prior to trial, to examine the debris found on his clothing and refused to permit his expert witness to examine the vials of retrieved hairs, thus inhibiting his preparation for trial and denying him "a right guaranteed by the Fourteenth Amendment to the Constitution of the United States." The only citation in support of this assertion is Rule 16, Federal Rules of Criminal Procedure, 18 U.S.C.A. A reading of Rule 16 immediately discloses that its language has no application to the practices in state courts, and cannot by the most strained interpretation be incorporated into the Fourteenth Amendment to the United States Constitution as a limitation on state action. Furthermore, there is no factual support in the record for defendant's claim that he was denied reasonable opportunity to prepare for trial. The record indicates that defendant's expert witness had access to the prosecution's exhibits prior to his testimony and that he was allowed to examine the hair mounted on slides under microscope and to make notes on his findings. He was able to use these findings in an attempt to rebut the testimony given by the police expert. The fact that there was a change in the condition of the exhibits through deterioration and obscurity did not deny defendant the opportunity to provide his rebuttal evidence. Furthermore, had defendant's expert deemed it necessary he could have improved the condition of the exhibits through the application of a chemical substance. Defendant's assertion that he was denied due process of law is without reasonable support in law or in fact. (*People* v. *Shafer,* 101 Cal.App.2d 54, 59-60 [224 P.2d 778]. See *People* v. *Gatti,* 167 Misc. 545 [4 N.Y.S.2d 130, 132].)

Defendant challenges the testimony of the police chemist upon two grounds: (1) the matters testified to by him were a subject of common knowledge and not of such a character as to justify expert testimony; and (2) he was not an expert on furs. Comparing hairs of fur-bearing animals is a technical matter justifying, if not requiring, the use of a

microscope. The average layman is not adept at comparing objects under such an instrument. It was therefore proper to permit an experienced and skilled person to give the jury the benefit of his expert comparisons. (See *People* v. *Horowitz*, 70 Cal.App.2d 675, 689-690 [161 P.2d 833].) In this connection it is to be noted that the defendant made use of an expert in this field.

The police chemist did not claim to be an expert on furs. His qualifications were that he was an expert in comparing objects under the microscope. His testimony was that he had compared the hairs from known samples of furs, which had been furnished by the furriers, with those which were found on the inside of defendant's clothing, and that he found certain similarities. It is to be recalled that defendant's expert substantiated the testimony and conclusions of this witness in certain particulars. It was not necessary for him to be an expert on furs in order to give such comparative testimony. It was, of course, for the jury to determine the weight that should be given to such evidence. (*People* v. *Tucker*, 88 Cal.App.2d 333, 340 [198 P.2d 941].)

Defendant also complains of the admission in evidence of the fur samples on the grounds: (1) that they were incompetent, irrelevant and immaterial, and (2) no proper foundation had been laid. There is no merit in either of these contentions. The stolen furs were established to be of the mink family of different types, and it may be reasonably inferred that the hairs from other similar furs would have a similar appearance, so as to be of assistance in establishing the character of the hairs found in defendant's clothing. It was proper, therefore, to receive in evidence these samples for purposes of comparison. (See *People* v. *Miner*, 96 Cal.App.2d 43, 51 [214 P.2d 557].) The foundation for the introduction of these samples was clearly laid by the testimony of Mr. Walsh and Mr. Bertz who identified the type of fur from which the samples were taken.

Defendant complains of the trial court's refusal to give a series of proposed instructions to the effect that in order to consider the hairs that were found in defendant's clothing for any purpose the jury must find beyond a reasonable doubt that they came from the stolen furs, otherwise a not guilty verdict would be necessary. Such instructions were improper for two reasons: (1) They would have precluded a conviction based upon the other facts and circumstances in the case, and (2) no inference could be con-

sidered unless such inference was established beyond a reasonable doubt. "It is not the law, . . . that each fact in a chain of circumstances that will establish a defendant's guilt must be proved beyond a reasonable doubt. (Citations.) The doctrine of reasonable doubt applies to proof of *guilt* and not to the establishment of each incident or event inculpating the defendant. (Citation.) A reasonable doubt that would warrant acquittal is one that results or arises from 'a consideration of all the evidence' in the case." (Citations.) (*People* v. *Klinkenberg,* 90 Cal.App.2d 608, 632 [204 P.2d 47, 613].)

There was no error in the court's refusal to instruct that if the jury believed the defendant possessed the hairs by accident or in some other innocent manner a verdict of not guilty was required. There was no evidence that would justify such an instruction.

It is unnecessary to go into further details respecting other instructions which the court rejected because an examination of the instructions which were given shows that they were fair and comprehensive, and clearly and adequately stated the rules essential for the jury's guidance in determining the issues in this case.

The judgment and order denying a new trial are affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied August 21, 1952, and appellant's petition for a hearing by the Supreme Court was denied September 4, 1952. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.