[Crim. No. 3206.   First Dist., Div. One.   Nov. 13, 1956.]

THE PEOPLE, Respondent, v. CHESTER A. CHAPIN, Appellant.

James Martin MacInnis for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond M. Momboisse, Deputy Attorney General, Thomas C. Lynch, District Attorney (San Francisco), and Irving Reichert, Deputy District Attorney, for Respondent.

BRAY, J.—Defendant appeals from a jury conviction of the crime of grand theft and from the order denying motion for new trial.

### QUESTIONS PRESENTED

1. Sufficiency of evidence.
2. Refusal to instruct on suppression of evidence.
3. Admission of statement of witness to police in defendant's presence.
4. Alleged misconduct of assistant district attorney.

### FACTS

Paul Dudley occupied room 707 of the Essex Hotel. In a suitcase in the closet of that room he kept $44,700 in currency, consisting of five $1,000 bills, three $500 bills and the balance in $100 bills. On September 27th, about 1:30 a. m., Dudley left a bar where he had been since the previous afternoon. He was intoxicated. He hailed a cab driven by one Casner. Arriving at the hotel, Dudley discovered that he did not have sufficient money to pay the fare. The hotel clerk refusing to advance him any money, Dudley, Casner and the clerk went to Dudley's room, where Dudley took a $100 bill from his suitcase and paid Casner. Dudley produced a bottle and asked "Where are the girls." Casner suggested that the one Dudley had been with was probably at "Coffee Dan's" and at Dudley's request drove him there. Dudley refused to get out of the cab and paid Casner with a $100 bill, letting him keep the change. Casner then took him back to the hotel. On the way back Casner saw defendant's cab and signalled defendant to follow. Both cabs drove to the basement of a garage. Leaving Dudley in the cab, Casner went over to defendant and said, "I have a fare here who wants to have a little company." Defendant asked if Dudley had any money and Casner told him about the two $100 bills. They then got in the cab with Dudley. Defendant asked Dudley his hotel and room number and if he had a room key. Both drivers drank with Dudley. Casner then drove Dudley back to the hotel with the understanding that if defendant could get a girl he was to bring her to Dudley's room. In Dudley's room

Casner noticed the suitcase. It was partly open, exposing ends of the bills. Casner reached into it and pulled out a slip of paper on which "30,000" was written. Dudley was apparently unconscious, so Casner helped himself to three $100 bills. Leaving the room Casner met defendant and told him the whole story and offered to give defendant one of the bills. Defendant refused it but did take $60 in small bills. Defendant asked Casner to contact Dudley and try to get him to come out. Casner phoned the hotel asking for room 707. The clerk told him he did not want to ring the room as he thought Dudley had passed out. At defendant's suggestion Casner told the clerk that he had an appointment with Dudley at 4:30. The clerk reported that he rang the room but there was no answer. Casner and defendant separated and a few minutes later Casner saw defendant's empty cab about a quarter of a block from the Essex Hotel.

About 5 a. m. Robertson, another cab driver, saw defendant and one Patterson in defendant's private car. They motioned for him to stop. They told Robertson they had a millionaire that was on a party. Robertson joined them and they went to the Essex Hotel. Defendant let Robertson and Patterson out at the curb. The latter two registered at the hotel, getting a room on Dudley's floor. Defendant was to see them later and "get on with the ball." About noon Patterson and Robertson got tired of waiting and left the hotel. On the street they saw defendant sitting in his car. He urged them not to leave as the "ball" was about to start. But, at defendant's suggestion, Robertson and Patterson went to the Opera Club in Patterson's car. After a while in came defendant with Dudley, who was intoxicated. Defendant and Dudley left together and then Patterson and Robertson went to the Essex Hotel to meet them. Arriving there they saw a car, apparently defendant's, parked nearby. They went to their room in the hotel and when nothing happened they went home about 3 p. m. Casner saw defendant's car parked near the hotel at about 4 p. m.

About 11:30 p. m. Dudley awoke in his room to find both his suitcase and his typewriter gone. These had been found in the men's lavatory at the end of the hall. The suitcase had been cut open. The money was gone.

Defendant denied that Casner told him about the money in Dudley's room and that he had taken the money or ever been in Dudley's room. He testified that Patterson gave him $3,500 to invest in a Christmas tree venture. Two days later

defendant and a Mr. Lafayette left ostensibly for Oregon to purchase Christmas trees. They stopped in Oakland at the home of one Newman. There defendant received a check for $1,000 made out to Ray Scott, the name he used in the tree negotiations. Defendant took Newman's automobile, transferring to it a tool box and a tire, in which he admitted he had concealed $18,000. Lafayette and defendant arrived in Truckee a little past midnight. As it was too early to contact the man from whom defendant planned to buy trees, he suggested they go on to Reno, have breakfast and return later in the day. At Reno, after breakfast and driving around town, Lafayette gave defendant $10 to bet for him. Later defendant gave Lafayette two $100 bills to gamble with, telling him to make small bets only. Again, defendant gave him seven $100 bills. Lafayette noticed that defendant had a $1,000 bill. Before leaving the gambling hall defendant took the money Lafayette had and turned it into the cashier for safekeeping. Next morning they went to another gambling place. Defendant gave Lafayette some small bills to be changed into $50. About 10:30 defendant presented certain oily bills to the cashier. They later returned and defendant cashed some more oily bills. A special officer standing nearby, thinking that the bills might be counterfeit, took defendant's name and address. The officer noticed that there were three $500 bills and some smaller ones, all of which defendant changed to $50's. Defendant said that he had spilled oil on them when they were stored in the trunk. They did not gamble at this place. They then went to another gambling club. Here defendant slipped into Lafayette's pocket about $4,300 wrapped in a napkin. Defendant said he was seeking a check from the cashier because he was warned he was going to be robbed. He stated that he did not turn in the money he had put in Lafayette's pocket because it contained the $3,500 he had received from Patterson, and he was afraid it might be counterfeit.

Defendant was then arrested. He told the police that he had arrived in Reno with $7,000, and that the rest was winnings. Of the $7,000 he said about $4,000 had been accumulated by him since the first of the year and that the balance, "approximately $4500," was probably money that the police were investigating at the time, but he was not at liberty to disclose from where it had come. He also told the police that he knew there was not as much money involved in the theft as they asserted there was, that he could not disclose who was involved in the theft, but that if when they got back to

San Francisco he was freed, "he could probably find out or recover the rest of the money through those people that were involved." He further said that if he was unable to find the money, he would disclose who were the people involved in the case.

### 1. *Sufficiency of the Evidence.*

Defendant points out that the evidence was circumstantial,[*] and claims that it was as consistent with defendant's innocence as with his guilt, and was not sufficient to support a conviction. "When his appeal is on the ground that the evidence is not sufficient to sustain the finding of the jury, the burden is on appellant to demonstrate that there is no evidence of a sufficiently substantial character to support the verdict upon any reasonable hypothesis whatever. It is not enough that the established facts and circumstances may be reconciled with the innocence of the accused. Before a reversal may be had, the facts must disclose no reasonable basis for any inference other than appellant's innocence." (*People* v. *Hatton,* 114 Cal.App.2d 195, 196 [249 P.2d 901].)

Defendant relies upon the following circumstances in support of his contention. No one saw defendant in Dudley's room; there was no exclusiveness of opportunity in defendant for the perpetration of the theft as Casner admittedly took some money from the suitcase and Patterson had a room on the same floor as Dudley and had possession of money which defendant contends might have been Dudley's.[†] Robertson and Patterson both were in Dudley's company.

From the time when Casner told defendant about the money in Dudley's room defendant was much interested in Dudley. At about 4 a. m. he had Casner endeavor to get Dudley to come out. Shortly after 4:30 Casner saw defendant's car parked near the Essex Hotel. About 5 a. m. defendant let Robertson and Patterson out at the Essex Hotel and was to contact Dudley. About noon Dudley was seated in his car in front of the hotel. A little later defendant brought Dudley in to the Opera bar. Although he testified he just happened to meet Dudley on the street and went searching from bar to bar to meet Patterson and Robertson, Robertson testified

---

[*]Theft may be proved by circumstantial evidence. (*People* v. *Kross,* 112 Cal.App.2d 602, 610 [247 P.2d 44].)

[†]Patterson evidently fled the community immediately after Dudley's loss. He was arrested by federal authorities and convicted of counterfeiting.

he had previously told them to go to the Opera Bar as the party was about to start. Defendant left with Dudley, and Robertson saw defendant's car parked near the Essex Hotel. Casner saw it there at about 4 p. m. Defendant claimed that at this hour he was in Rodeo with one Cotter, a realtor, who corroborated him, basing his recollection of the day on a notation in his day book. The book failed to show comparable notations of any other appointments. This alibi was further weakened by the fact that the same evening he and Patterson arrived at the Newman home together. To make it appear that defendant was not with Patterson that afternoon or evening, defendant denied coming to the Newman home with Patterson, but claimed to have been driven in his truck by an employee who left immediately, and that Patterson did not arrive until 15 minutes later. Defendant claims he did not enter the Essex Hotel after bringing Dudley there from the Opera bar, yet his car was seen parked near the hotel shortly after he returned Dudley to his hotel.

While others had an opportunity to take Dudley's money, all of the circumstances taken together show that it was defendant who actually did take it. The many statements made by defendant contrary to those of other witnesses, the actions of defendant at Reno in getting rid of the bills which he had, and his explanation of his having the money, fully justify a finding that he had taken Dudley's money. The evidence is reasonably subject to the conclusion that defendant's trip to Reno was for the purpose of changing Dudley's bills for others of smaller or different amounts. He claims he was going to contact Newman in Truckee concerning Christmas tree stumpage; yet he did not plan to leave for Truckee until 8 p. m. He was going to stop on the way and negotiate for a sale of his motel. It obviously would be impossible to arrive in Truckee at a reasonable hour to contact Newman. He drove through Truckee without stopping and without attempting to contact Newman. Defendant instructed Lafayette to convert the $100 bills which he gave him into $80 in chips and $20 in silver. Defendant did not use the chips for gambling, only the silver. Defendant had his companion change money into $50 bills, and deposited $13,600 in one club, receiving a check therefor. At the Nevada club he only changed bills, some of $500 denomination. He told two different stories about the oil on the bills, one being that he spilled oil on them in the trunk. The trunk was shown to have no evidence of oil in it. After a police officer seemed interested in oily bills, defendant

surreptitiously put some $4,300, wrapped in a paper napkin, in his companion's pocket.

■ He admitted that part of the money he had at Reno was some of the money stolen from Dudley, and offered no explanation of how he got it, although at the trial he claimed Patterson gave it to him to invest in Christmas trees. Patterson at the time was driving relief for defendant, because Patterson needed money. Patterson was then buying defendant's automobile, but he did not pay for it. Later defendant swore out a complaint for Patterson's failure to pay for the car. Defendant when shown a picture of Dudley by the police denied knowing him. His explanation at the trial was that it was held too far away by the Reno police for him to see it clearly. It actually was shown him at close range, not by the Reno police, but by the San Francisco police. At the trial he claimed he told the Reno police that he arrived there with $14,000, not $7,000, as they testified. He denied telling that he had won any money, and testified that he did not know if he had or had not won any money. Defendant denied presenting a $500 bill at the Nevada club.

His explanation on the stand of the source of the money found on him is subject to considerable question. Nine thousand dollars he claims was from the sale of Christmas trees the previous year. This money he kept in a company safe and a strong box at his home. Defendant had no bank account and his credit was poor. Three thousand dollars he claimed was two months' profit of a small hotel at Rodeo illegally operated. Five hundred dollars came from his wife's strong box.

While, of course, it is impossible to identify currency (unless the numbers are known), the similarity in the size of the bills in the possession of defendant with those of the victim, particularly large bills which generally are not carried, is significant. ". . . although the fact that defendant used 'money of the same kind as that which was recently stolen' ordinarily would constitute but slight evidence of the guilt of defendant, nevertheless, if such money was of a kind 'rarely seen in circulation,' the weight to be attached to such evidence is considerably increased . . ." (*People* v. *McClain*, 115 Cal.App. 505, 509 [1 P.2d 1085].)

In *People* v. *Thompson*, 120 Cal.App.2d 359, 363 [260 P.2d 1019], the court said concerning similarity in moneys: ". . . the question of the identity of the property stolen was one of fact for the jury to be considered with all the other

evidence." The jury could well conclude that the three $1,000 bills and the three $500 bills were part of the stolen property. It must be remembered in this behalf that defendant admitted that some of the money was part of that stolen. Thus we have opportunity to commit the crime, proof of possession of stolen property (and in such case " 'slight corroborative evidence of other inculpatory circumstances' " tending to show his guilt will support a conviction (*People* v. *Wissenfeld*, 36 Cal.2d 758, 763 [227 P.2d 833])), fantastic stories contradicted by the facts ("The giving by the defendant of false testimony may well have been regarded by the jury as in itself indicative of a consciousness of guilt" (*People* v. *Crotty*, 70 Cal.App. 515, 518 [233 P. 395])), and defendant's own contradictory stories. There was ample evidence to support the conviction.

### 2. *Refused Instruction.*

During the trial defendant demanded the production of the original reports to the police of certain policemen and the original statements made to the police by Dudley, Casner and certain persons connected with the Essex Hotel. The court properly refused to order them produced. (See *People* v. *Wilkins,* 135 Cal.App.2d 371 [287 P.2d 555].) No complaint is made of this ruling. With that background, however, defendant contends that the giving of a certain instruction and the refusal to give one offered by defendant constituted prejudicial error. The court instructed: "Neither the prosecution nor the defense is required to call as witnesses all persons who are shown to have been present at any of the events involved in the evidence or who may appear to have some knowledge of the matters in question in this trial; nor is the prosecution or defense required to produce as exhibits all objects or documents that have been referred to in the testimony, or the existence of which may have been suggested by the evidence." This type of instruction has been held proper. (*People* v. *Reingold*, 87 Cal.App.2d 382, 408 [197 P.2d 175].) As said in *People* v. *Tuthill*, 31 Cal.2d 92, 98 [187 P.2d 16] : "There is no compulsion on the prosecution to call any particular witness or to make any particular tests so long as there is fairly presented to the court the material evidence bearing upon the charge for which the defendant is on trial. (*People* v. *Larrios*, 220 Cal. 236, 251 [30 P.2d 404]; *People* v. *Simpson*, 66 Cal.App.2d 319, 329 [152 P.2d 339].)" (See also *People* v. *Parry*, 105 Cal.App.2d 319, 322 [232 P.2d 899];

*In re Horowitz,* 33 Cal.2d 534, 540 [203 P.2d 513].) The latest approval of the instruction appears in *People* v. *Watson* (July, 1956), 46 Cal.2d 818, 829 [299 P.2d 243]: "The instruction that neither side was required to produce all witnesses who might be able to testify to that particular fact has a practical premise, for otherwise there would be a repetitious recital of testimony which would prolong the trial beyond reasonable limits. Under the circumstances, it would seem that defendant's remedy would have been to have called the witnesses on his own behalf if he believed their testimony would hav aided his cause. (See *People* v. *Powell,* 83 Cal.App. 62, 67-68 [256 P. 561].)"

Defendant offered the following instruction: "In view of the greater duty which our law imposes upon the prosecution for the production of evidence, a further rule of law must be explained: If the prosecution has within its power the production of certain evidence and fails without explanation to produce such evidence, you are entitled to draw an inference that such evidence, if it had been produced, would have been adverse, or inconsistent with, the theory of the prosecution." The court refused the instruction. Defendant apparently had in mind section 2061, Code of Civil Procedure, subdivisions 6 and 7: "6. That evidence is to be estimated not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; and, therefore,

"7. That if weaker and less satisfactory evidence is offered, when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust."

However, it should be pointed out that this proposed instruction does not embody the meaning of those subdivisions. The section requires in order that adverse inferences may be drawn that the evidence not produced be stronger and more satisfactory than that which was produced. The proposed instruction has no such requirement. Under it the evidence which is not produced could be weaker and less satisfactory than that which was produced and yet the jury is told to draw an inference from its nonproduction that an adverse inference should be drawn. A literal reading of the instruction would, in effect, require in a criminal case a calling by the prosecution of all the witnesses shown to have some knowledge of the matters in question, and the production of all evidence in anywise bearing on the case, a requirement which

the above cited cases hold to be unnecessary. The form of the instruction makes it completely in conflict with the foregoing instruction. But a reason more important than the improper form of the instruction justified the court in refusing the instruction. The defendant offered the instruction to cover the failure of the prosecution to produce the police reports and statements taken of other persons during the police investigation of the crime, notes of a police inspector, to call the hotel clerk, the prostitute with whom Dudley spent some time, a woman in the Essex Hotel who occupied the room next to Dudley's and Patterson, then in the custody of the federal authorities in Los Angeles. As to the records, statements and notes—the ruling of the trial court refusing to require their production being proper as we have shown, no adverse inference could be drawn from their nonproduction. The witnesses who were not called come within the rule of the cases above cited. See also *People* v. *Brown,* 71 Cal.App. 181, 188 [235 P. 72], where the court held proper the refusal to give an instruction offered by the defendant in the language of section 2061, subdivision 7, Code of Civil Procedure. The offered instruction was based upon the failure of the prosecution to call certain persons who were present as the guests of the prosecuting witness at the time when the jewelry which was later stolen was exhibited. In *People* v. *Hightower,* 40 Cal.App.2d 102, 107 [104 P.2d 378], the rejection of an instruction based upon subdivisions 6 and 7 of section 2061, Code of Civil Procedure, was held not to be error. (The facts to meet which the instruction was offered do not appear.) In *People* v. *Cuff,* 122 Cal. 589 [55 P. 407] (cited with approval in the Hightower case, *supra,* and in *People* v. *Charles,* 9 Cal.App. 338, 340 [99 P. 383]) the court held that it was erroneous to give an instruction based upon subdivisions 6 and 7, section 2061, Code of Civil Procedure, offered by the prosecution, for the reason (p. 591) : ''Indeed, as to subdivisions 4, 6 and 7 of the section, upon the trial of criminal cases it were best they should not be noticed, for, as generally applied, they trench upon the constitutional rights of the defendant in depriving him of a verdict rendered by jurors who are the sole and exclusive judges of the weight and effect of evidence. The danger lurking in these subdivisions of the section is found in the fact that they attempt to deal with the weight and effect of evidence—matters for the jury and not matters for legislative action.'' While this statement may be

too broad,* this instruction should not be given unless the evidence indicates a wilful suppression of evidence. See *People* v. *Torterice,* 66 Cal.App. 115, 124 [225 P. 760], where the court held that the refusal to give an instruction to the effect that " '. . . the unexplained failure to call and examine as a witness a person who has peculiar knowledge of material facts . . .' " raised an unfavorable inference but if error was not prejudicial because of the improbability that the witness' testimony would actually have been unfavorable.

In *People* v. *Reid,* 193 Cal. 491 [225 P. 859], relied upon by defendant, certain letters written by the defendant to a fellow prisoner were admitted in evidence. Their date and the date of their receipt was not shown as the fellow prisoner was not called. In holding that it was not necessarily incumbent upon the prosecution to call the fellow prisoner as the failure to do so merely went to the weight of the evidence, the court added (p. 495): "Of course, the defense would have been entitled to an instruction to the jury, and doubtless one would have been given had it been requested, to the effect that in weighing this evidence the jury should be guided by the provisions of section 2061 of the Code of Civil Procedure, which provides that 'if weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust.' " The Reid case is distinguishable from ours for several reasons: The court there was discussing the production of weaker evidence than was available to the prosecution. Here there is no such situation. Defendant's desire to see the police records and statements is not based upon a claim that they contain stronger evidence than that produced, but upon a hope that he might find something in them contradictory to the evidence produced. As to the witnesses not called, there is nothing to indicate that their evidence would have contributed anything to the case. Moreover, all of the witnesses mentioned were available to him. He could have called them, even the witness Patterson, who was in federal custody. The same process open to the prosecution for the production of a federal prisoner is open to the

*Section 2061, Code of Civil Procedure, provides that "on all proper occasions" the jury are to be instructed on the points set forth in that section. Thus, the real test of whether an instruction in proper form under any subdivision of that section should be given is whether the circumstances of the case constitute a proper occasion for the giving of it. As herein pointed out, we do not believe that the circumstances here called for such an instruction.

defense. See *People* v. *Torterice, supra,* 66 Cal.App. 115, 124, and *People* v. *Brown, supra,* 71 Cal.App. 181, 188, holding that an instruction of the type offered here is properly refused if based upon the prosecution's failure to call a witness available to the defendant. "The facts testified to by these witnesses tended to establish the guilt rather than the innocence of appellant, and the district attorney was under no duty to use them as witnesses if their testimony was not needed to make out a case for the People. The fact that they made some statements which were favorable to appellant does not change the situation, especially where they were available and were called as witnesses for the defendant." (*People* v. *Simpson,* 66 Cal.App.2d 319, 329 [152 P.2d 339]; see also *People* v. *Watson, supra,* 46 Cal.2d 818, 829.)

Moreover, the instruction suggested in the Reid case is completely different from the one offered here, and points up the vice of the offered instruction. The Reid case instruction deals with the failure to produce "stronger and more satisfactory" evidence, whereas the instruction in our case deals with the nonproduction of any evidence, including that of equal value with that produced and merely cumulative, and that of weaker and less value. See *Gibson* v. *Kennedy Extension G. Min. Co.,* 172 Cal. 294, 305 [156 P. 56], where the plaintiff testified to the happening of an accident but did not call an eyewitness thereto. The court held that such failure was not a case to which subdivision 7 of section 2061, Code of Civil Procedure, could be applied for the reason that the plaintiff in testifying "was giving evidence which was not in a legal sense 'weaker' than that of any other eye-witness." (P. 305.)

*People* v. *Ruef,* 14 Cal.App. 576, 612 [114 P. 48, 54], does not help defendant. There the defendant offered an instruction to the effect that the failure of the prosecution to call three ex-supervisors raised a presumption that their testimony would have been adverse to the prosecution. The reviewing court held that such instruction was properly refused. The trial court did give an instruction, not of the kind requested by defendant here but in the exact language of section 2061, subdivisions 5 and 6. The defendant objected thereto, but the reviewing court held (p. 612): "The defendant by his request, having invoked the principles of law stated in the sections, and cited the sections as authority, and asked the court to instruct in regard to them, cannot now complain because it was not a proper occasion for giving such instruc-

tions." In our case, the occasion was not a proper one, and the offered instruction was also improper.

### 3. *Statement of Casner.*

On October 4, 1954, the police took a statement from Casner detailing his connection and that of defendant with Dudley. Defendant was present at the taking of the testimony. He was asked if he would stay and listen to Casner's statement and was not required to remain if he did not wish to. His remaining was voluntary. In the statement Casner told approximately the same story concerning defendant's relationship with Dudley and the money that he related at the trial. The statement, of course, was accusatory of defendant. At its end defendant was asked if he had heard the statement and he said he had. He was then asked: "Q. Is this a true statement as far as Dave has related it? A. As well as I could say. Q. As well as you recall it is a true statement? A. Yes. Q. Is there anything in this statement that you would like to change or add to? A. No, not at this time." In the statement there were certain conclusions by Casner as to defendant's motives. Instead of asking the court to require their elimination, defendant waited until they were read to the jury. Then a colloquy ensued between the court and counsel in which the court offered to strike the conclusions if defendant desired. Defendant then asked that the jury be instructed that Casner's conclusions were not binding on defendant. This the court did and instructed the jury to disregard the specific portions of the statement. Although a better method would have been to call these objectionable parts of the statement to the court's attention out of the presence of the jury and have them deleted, their presence did not make the rest of the statement inadmissible. Defendant, relying on *People* v. *Simmons,* 28 Cal.2d 699 [172 P.2d 18], contends that the statement as a whole was inadmissible. However, the situation here was different from that in the Simmons case. With the exceptions in which Casner gave his opinions of defendant's motives (three in number) the statement was a narrative of Casner's connection with the Dudley affair and with defendant. Defendant's presence at the taking of the statement was voluntary and his replies to the questions as to the accuracy of the statement were likewise voluntary. In the Simmons case the defendant refused to reply to the statement read to him. In *People* v. *Spencer,* 78 Cal.App.2d 652 [178 P.2d 520], the defendant

first refused to reply to a question concerning the accuracy of a codefendant's statement to police officers and then denied it. In *People* v. *Bob*, 29 Cal.2d 321 [175 P.2d 12], the defendant likewise denied the codefendant's statement. In *People* v. *Spencer, supra,* 78 Cal.App.2d, the court said at page 655: "In the case of *People* v. *Simmons,* 28 Cal.2d 699, 712 [172 P.2d 18], the Supreme Court held that accusatory statements of the character here involved are plain hearsay, and may properly be admitted only as admissions, under the well-known exception to the hearsay rule. That if such statements are denied then there is no admission and the statements cannot properly find their way into the record. If the accused admits the truth of such statements, then, of course, they may be admitted into evidence." It further stated (p. 656) : "Whatever may be the rule in other jurisdictions, it is now firmly established in California that the admissibility of evidence of the character with which we are here concerned depends upon whether the occasion and the circumstances were such as to afford the accused person an opportunity to act or speak, and whether the accusatory statement was one made upon such occasion and under circumstances that would naturally call for some action or reply. Each case must, therefore, be determined upon the facts and circumstances therein presented." "Defendant's responses to accusatory statements may find their way into the record only under the admission exception to the hearsay rule. If the accused person expressly admits the truth of the accusatory statement, both the statement and answer may be admitted. If the accused person expressly denies the accusatory statement, there is no admission. If the accused makes an evasive or equivocal reply which is not directly responsive to the accusatory statement, or remains silent, it has been held that under certain circumstances both the accusatory statement and the response are admissible. In any event, when the accusatory statement is admitted, it is not admitted as proof of the facts asserted in the statement. Such statements are admitted only to show the reaction of the accused." (*People* v. *Davis,* 43 Cal.2d 661, 670 [276 P.2d 801].) Applying the above test here, the statements and defendant's comments on it were admissible.

4. *Alleged Misconduct.*

■ On motion for new trial defense counsel filed an affidavit charging the assistant district attorney with making

in his argument to the jury a certain statement concerning one of his reasons for not producing the original police report demanded by defendant, which statement defendant contends was prejudicial misconduct. Unfortunately, the record before us does not contain the arguments of either counsel. As said in *People* v. *Best*, 43 Cal.App.2d 100, 105 [110 P.2d 504], "Since there is in the record neither argument of the district attorney nor assignment of error by appellant, we are in no position to determine that any prejudicial error occurred." Moreover, defendant states that when defendant assigned the statement as misconduct the trial court instructed the jury to disregard it. We see no reason why the error was not cured. (See *People* v. *Caetano*, 29 Cal.2d 616, 619 [177 P.2d 1]; *People* v. *McCracken*, 39 Cal.2d 336, 349 [246 P.2d 913].)

The judgment and order are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 12, 1956. Carter, J., was of the opinion that the petition should be granted.